[No. B163498. Second Dist., Div. Seven. Apr. 6, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
TOM BLAKE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III and IV.

### COUNSEL

Greg M. Kane, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Thien Huong Tran, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**JOHNSON, Acting P. J.**—For his nine-day crime spree a jury convicted appellant, Tom Blake, of 10 counts of robbery, one count of attempted robbery, one count of carjacking, one count of burglary, one count of petty theft with a prior and one count of vehicle theft. The jury also found true numerous enhancement allegations of personal use of a dangerous or deadly weapon and of personally inflicting great bodily injury. The trial court sentenced appellant to a total term of 51 years and eight months as a second "strike" offender.

Appellant contends the evidence does not support the finding he used a noxious or caustic chemical spray as a dangerous or deadly weapon and thus the enhancements must be reversed on three of the counts. He also argues evidence he pushed one of his victims is insufficient evidence of force to sustain one of the robbery convictions. Regarding the same count, appellant argues the trial court had a sua sponte duty to instruct the jury with a definition of the quantum of force required to sustain a robbery conviction.

Appellant next claims the enhancement imposed for having inflicted great bodily injury must be reversed because the information failed to provide adequate notice of the enhancement allegation in connection with the robbery count on which it was imposed. Finally, appellant argues the trial court improperly used the fact of his prior conviction to both impose a five-year sentence enhancement under Penal Code section 667 and a one-year enhancement for having served a prior prison term. The People concede the latter error.

We will modify the judgment to strike the one-year enhancement imposed for having served a prior prison term. As so modified, we affirm.

## FACTS AND PROCEEDINGS BELOW

*La Tiendita Santa Barbara—Robbery, Dangerous Weapon, Counts 1 and 2:*

In the evening of November 16, 2001, appellant entered a women's clothing store called La Tiendita Santa Barbara in West Hollywood. He was dressed in men's clothing. However, he was wearing mascara, eye shadow and had his dyed hair wrapped in a bandana. He had shaved or heavily plucked eyebrows and an effeminate manner. He had a prominent Adam's apple and a crooked nose which looked as though it had once been broken.

Sales clerks Luis and Carol Ruano were working in the store when appellant came in. They noticed appellant and both got the impression he was "high" on drugs because his eyes were red, he was sweating profusely, and he was nervous.

Appellant selected several items of clothing and brought them to the counter. Luis Ruano totaled the amount of the items which came to $78. Appellant seemed to reach for his wallet but then said, "No, fuck that." He drew two knives, a box cutter in one hand and a three-blade knife in the other, and brandished them at the sales clerks. One of the knives came within inches of Carol's face. Appellant told them, "If anybody moves, I am going to fuck you up." Appellant grabbed the clothes and ran out of the store. Appellant ran right past sales clerk, Juan Ruano, who was watching the outdoor clothes display.

All three Ruanos positively identified appellant from a photo array and again at trial.

*Sabina's Wigs—Robbery, Dangerous Weapon, Count 3:*

At 1:00 p.m. on November 18, 2001, Sabina Hersco was in her store, Sabina's Wigs located on Fairfax near Melrose Avenue. Hersco was then

fitting a wig for Zhaleh Javanfard, an Orthodox Jewish woman whose religion and tradition requires her to cover her hair in the presence of men other than her husband. She was shocked and horrified when appellant walked into the store. Both women thought the door was locked.

Appellant started looking around the store. He wore a bandana over his hair, a woman's crop top and bell-bottom pants. Appellant had shaved or plucked eyebrows. Hersco asked appellant to leave and told him to come back some other time. Appellant pulled out a canister and told Hersco to "back up, back up." According to Hersco, appellant took the "pepper spray and he put in my eyes [*sic*]." He also sprayed the substance around the store. Appellant grabbed two long human hair wigs worth several hundred dollars and fled.

The spray caused Hersco's eyes to tear. She could not see and could not breathe. She began coughing and gasping for air and her face became red. Hersco screamed her eyes were burning. When Javanfard came to her assistance she too began coughing and sneezing and could not breathe. Javanfard called 911 and the operator sent paramedics to assist them.

Javanfard identified appellant from a photo array, at the preliminary hearing, at trial and from a videotape taken by a security camera in the store.

*Ultra Vixen—Robbery, Dangerous Weapon, Count 4*:

Around 2:30 p.m., sales manager Jenifer Weber was working at a lingerie store called Ultra Vixen on Wilcox in West Hollywood when appellant entered the store. He was wearing a dirty crop top blouse and low cut jeans with a rope belt. He had shaved eyebrows and wore old, smeared makeup. He went in and out of the store, explaining he was waiting for his boyfriend to pay for his purchases. Appellant asked Weber how a particular belt buckle worked. As she approached to explain, appellant pulled out a canister she believed to be pepper spray. He said, "Don't move bitch," and sprayed the chemical into her eyes from about eight inches away. Appellant grabbed several rhinestone belts, jeans and other clothes worth about $400 and ran out of the store.

Weber ran outside. Her eyes burned from the spray. She also could not breathe for 10 minutes.

Weber identified appellant from a photo array and at trial.

*Stephen Chapek—Robbery, Dangerous Weapon, Count 6*:

Around 7:00 p.m. on November 18, 2001, Stephen Chapek was in his car looking for a parking space near his residence in Silver Lake. Near Sunset

Boulevard and Golden Gate he saw appellant and another person walking together. Appellant wore a tube top, makeup and had long dark hair. Both persons were dressed as women and he assumed they were streetwalkers. Appellant and his friend approached Chapek's car and asked for a ride to Hollywood. Once he spoke, Chapek realized appellant was a man. Chapek refused but appellant and his friend got into his car anyway and would not leave. Appellant claimed to be sick. Chapek testified he felt sorry for appellant and wanted to avoid a confrontation so he agreed to drive them to Hollywood. While driving, appellant asked whether Chapek wanted him to "suck his dick." Chapek declined.

Chapek stopped at a donut shop near Hollywood and Highland as appellant requested. As his companion got out of the car appellant demanded $20. Chapek refused. According to Chapek, appellant took a canister out of his purse and told him, "Give me money or I am going to mace you." Chapek gave appellant the $1 he had in his wallet and appellant left. Chapek then noticed his cell phone was missing.

Chapek identified appellant from a photo array and at trial. He recognized the distinctive crook in appellant's nose.

*Arsen Mkrtchyan—Carjacking, Dangerous Weapon, Count 7:*

On November 20, 2001, around midnight Arsen Mkrtchyan was driving down Santa Monica Boulevard in West Hollywood, purportedly on his way to pick up his brother from his work place at Hollywood and Highland. He drove a 2000 silver Daewoo with tinted windows. He saw appellant in women's clothing. He had on black pants, a pink shirt, a longhaired wig and makeup. He stopped his car near appellant with the intention of asking for sex. Appellant walked over, got into the passenger seat and asked Mkrtchyan what he was "looking for." Appellant coughed and stated he had not worked on his voice yet. Mkrtchyan stated he wanted oral sex and appellant asked how much money he had. Mkrtchyan replied he had seven dollars. Appellant asked Mkrtchyan to take his penis out. He complied. Appellant began to fondle Mkrtchyan's penis and then suggested they go to appellant's place instead. Appellant provided directions and then told Mkrtchyan to stop in a parking lot at Tamarind and Santa Monica. Appellant started fumbling around in his purse claiming he was looking for a condom. Appellant pulled out a box cutter. Appellant brought the knife close to Mkrtchyan's face and told him to get out of the car, "or I am going to shank you." Appellant grabbed the car keys, opened the door and yelled to a man standing nearby in the parking lot. Mkrtchyan fled, fearing the two men were working together. Appellant got out of the car to speak with the man. Mkrtchyan took the opportunity to run back to his car to retrieve his wallet and cell phone. Appellant returned and drove off in Mkrtchyan's car.

Mkrtchyan used his cell phone to call 911. When police arrived he told them he had picked up a hitchhiker who had stolen his car. He was too embarrassed to admit he had been carjacked by a transgender prostitute he had picked up for the purpose of having sex. When his car was recovered days later the interior was filled with trash. There were rotting groceries in the trunk as well as numerous flyers advertising gay parties. In addition to his car key, his key ring also had numerous additional unfamiliar keys.

Mkrtchyan identified appellant at trial, stating he recognized appellant's eyes, eyebrows and crooked nose. Mkrtchyan also recalled appellant had a tattoo on his left bicep area.

*Antenna Clothing—Robbery, Dangerous Weapon, Count 5*:

In the late afternoon of November 20, 2001, Hamid Habibian and Antonette Jackson were working as sales clerks at the Antenna Clothing store on Hollywood Boulevard. Appellant entered the store wearing men's clothing but with a bandana around his head. He had shaved or plucked eyebrows. Jackson heard another employee yell out appellant was running out of the store with merchandise. Jackson started to pursue him. Appellant turned and brandished an eight-inch knife. Habibian saw appellant pull out what appeared to him to be a hunting knife and saw him make jabbing motions at the employees to ensure they kept their distance. Appellant fled the store with women's clothing valued between $400 and $500. Habibian saw appellant get into the passenger side of a waiting silver sedan with tinted windows. Jackson got a partial license plate number and called police. The car turned out to be Mkrtchyan's silver Daewoo.

Jackson identified appellant from a photo array, at the preliminary hearing and at trial. Habibian testified appellant resembled the robber because of his high forehead, thin eyebrows, and distinctive nose.

*No No Price—Robbery of Lionel Levy, Petit Theft of No No Price, Counts 8 and 9*:

Lionel Levy owns a women's clothing store on Sunset Boulevard called No No Price. At approximately 6:30 in the evening of November 20, 2001, appellant entered the store. Levy recognized appellant as someone who had been in his store several times before. Levy discovered something missing from his store after each of appellant's visits. Appellant was dressed as a "girl" with tight women's jeans and he was wearing makeup. Appellant tried on several pairs of jeans in a fitting room. He put on his own jeans over a pair of the store's jeans and ran from the store. Levy tried to block appellant's escape at the doorway. Appellant shoved Levy out of his way using both hands. Appellant jumped into a waiting car, which immediately sped away.

Levy and his employee identified appellant from a photo array and at trial.

*Enzo Barbera—Robbery, Dangerous Weapon, Great Bodily Injury, Count 10*:

Between 1:00 and 2:00 a.m. on November 22, 2001, Enzo Barbera was driving in the area of Hollywood and Highland purportedly to look at the new Kodak Theater. He had his left arm resting on the open window on the driver's side of his car. At a stoplight appellant came to his open window and grabbed his arm. Appellant was clean-shaven, skinny, and wearing a bandana. Appellant demanded money. Barbera gave appellant the $40 he had. Appellant told Barbera, "Give me everything or I will cut you." Barbera hesitated and appellant cut his wrist area with a knife. Barbera threw his wallet at appellant. His wallet contained his credit cards, driver's license, Social Security card and other papers. Barbera drove himself to a hospital for treatment. Barbera suffered nerve and tendon damage. By the time of trial he still suffered numbness in his thumb and fingers.

Barbera cancelled two of his three credit cards when he got home from the hospital. He forgot he had a third credit card in his wallet. Appellant used Barbera's credit card to purchase hundreds of dollars worth of items: groceries at a Ralphs store, groceries at a Pavilions market, food, telephone calls and lodging at the Hyatt Hotel on Sunset Boulevard in West Hollywood, and cosmetics and other items from a Rite Aid drug store on Centinela Boulevard in Culver City.

Barbera was not able to identify appellant from a photo array or from the security videotape taken of someone using his stolen credit card at the Pavilions store. However, the videotape showed the checker scanning grocery items that were later found rotting in the trunk of Mkrtchyan's car when he recovered it.

*Isa Clothing—Burglary, Count 11*:

Douglas Ayala owns a small clothing store at the corner of Centinela and Washington Boulevards in Culver City. Around noon on November 22, 2001, there were no customers in the store. Ayala stood outside his store in the doorway. A silver car pulled into his parking lot and two men got out of the car. Appellant drove the car. He wore a sleeveless crop top, bell-bottom pants, sandals, make up and a long hairpiece. Appellant had a large nose and a long green tattoo on his upper left arm. The men walked to the nearby Rite Aid drug store.

They returned to Ayala's store carrying Rite Aid bags. For 20 to 30 minutes appellant's companion tried on women's clothes. When it came time to settle

the bill appellant handed Ayala Barbera's credit card. The man depicted in the picture on the credit card was not appellant. Barbera was nearly twice as large and did not look at all like appellant. Appellant showed Ayala a driver's license, which matched the name and picture of the person on the credit card. Ayala tried the credit card but the transaction was declined. Appellant produced a second credit card from Barbera's wallet. Ayala ran this card through the machine and received a message to call "central unit." Ayala called and the person at "central unit" asked to speak with appellant. Ayala handed appellant the phone. Apparently in response to questions appellant took out Barbera's Social Security card and told the operator Barbera's Social Security number. Ayala heard appellant say he did not know his home phone number and Ayala watched as appellant looked through the other papers in Barbera's wallet. The person at "central unit" told Ayala the transaction was not approved and directed Ayala to return the credit card to appellant. Ayala informed appellant the sale did not go through and asked appellant's companion to take off the store's clothing he was then wearing. Appellant's companion removed the clothes he had tried on except for a pair of panties. The men gathered up their Rite Aid bags and walked outside. When they reached the car in the parking lot appellant realized he did not have the car keys. Appellant went back inside the store and started yelling at Ayala. When Ayala stated he did not have appellant's keys appellant threatened to stab him. Ayala informed appellant he had already notified police. Appellant and his companion fled.

While waiting for the police Ayala started returning the merchandise to its proper spot and found a set of keys. One key operated Mkrtchyan's silver car which appellant had left in the store's parking lot.

Ayala identified appellant from a photo lineup and again at trial. At trial, he also identified Barbera's credit cards as the cards appellant had attempted to use at his store.

*You's Liquor—Attempted Robbery, Count 12:*

On November 24, 2001, Steve You was standing outside the door of his liquor store around 10:30 a.m. Appellant walked up and asked You to call him a cab. You told appellant to use the pay phone at the corner. Appellant pushed You, said he had a gun, and demanded money from You. You did not see a gun but appellant had his hands under his shirt and was pointing something at You through his shirt. You walked inside toward the register. You intended to give appellant the money he demanded. Appellant told You to hurry up and open the register. At that moment, several customers happened to enter the store at once and You felt more secure. You called 911 but told appellant he was calling him a cab. Apparently realizing You had

called the police, appellant opened his shirt revealing a Walkman and told You he did not really have a gun. Appellant fled from the store.

You identified appellant from a photo array, at the preliminary hearing and at trial. He also identified appellant as the man depicted in the liquor store's security videotape of the incident.

*Kara Spolsky—Auto Theft, Count 13*:

Around 11:00 a.m. on November 24, 2001, Kara Spolsky was in her car waiting for the light to change at the intersection of Wilton and Lemon Grove in Hollywood. She drove a Toyota Corolla. Spolsky's car's license plate number was 4GNW105 and she had a license plate frame which said "Alumni Rider University."

While waiting for the light to change, Spolsky noticed an angry group of men surrounding appellant and another man. A very large man was waving a knife at appellant. Appellant left the group and walked down the street toward Spolsky's car. As he neared, Spolsky opened her window and asked appellant whether he needed help. Appellant said, "Yes," and Spolsky handed him her cell phone. Appellant asked if she would instead take them to the police station a few blocks away. Spolsky agreed and appellant and his friend got into the back seat. Appellant had a prominent nose and reddish hair. He wore a nylon pullover jacket and his fingernails were painted with pastel glitter nail polish.

After she drove away appellant asked her to drive to his grandmother's house instead. Spolsky agreed and followed appellant's directions until he asked her to stop. Once she stopped the car appellant's friend started to exit but appellant stopped him. Appellant cursed at his friend and the men got into a loud and angry argument. Then appellant told Spolsky he had something he wanted to show her. Appellant began fumbling around in his jacket. Spolsky was afraid appellant might have some type of weapon. She felt threatened and nervous. She grabbed her cell phone and fled the car in a panic. When she turned around, she saw her car being driven away going the opposite direction.

Spolsky identified appellant from a photo array and again at trial.

*Jahangir A. Shirazi—Robbery, Dangerous Weapon, Count 15*:

Jahangir Shirazi owns a 99 Cent Store on Western Avenue in Hollywood. Around noon on November 25, 2001, there were no customers in the store. Shirazi saw a white car pull up and park in front. Appellant came into the 99

Cent Store and asked Shirazi for change. When Shirazi opened the register appellant pulled a knife and threatened to cut Shirazi if he did not move away. As appellant waved the knife it cut Shirazi's thumb. Appellant took between $200 and $300 and the change tray. He fled in the white car.

Shirazi's wound required stitches and later became infected. Shirazi identified appellant from a photo array, at the preliminary hearing and again at trial.

*Payless Shoes—Robbery, Dangerous Weapon, Count 16:*

Veronica Rangel was the manager of the Payless Shoes store on Vine Street. Around 6:00 p.m. on November 25, 2001, appellant came into the store. He selected some shoes and slammed the boxes on the sales counter. Rangel asked whether appellant was ready to pay for his items. Appellant drew a knife with a three- or four-inch blade and waved it six inches from Rangel's face. He told her, "Don't try anything. I am taking the shoes." Rangel put her hands up and backed up as far as she could behind the counter. Appellant grabbed the shoes and a few belts and left. She watched through the window as appellant got into a car. Rangel noted the car's license plate number as 4GNW105. She also noticed the license plate holder said something about Rider University. The car turned out to be Spolsky's car.

Rangel identified appellant from a photo array and at trial. She also identified the two pairs of shoes taken in the robbery

*Appellant's Arrest:*

In November 2001 Los Angeles Police Officer Joseph Bezak was working as an undercover vice officer in the Hollywood area. He was cruising near Santa Monica Boulevard when he spotted appellant and stopped his car. Appellant walked over and asked whether he was a cop. Bezak said no. Appellant got into his car and asked Bezak to show him his penis to make sure he was not a police officer. Bezak told appellant he could not do it right there but might do it somewhere else. Appellant got out of his car.

A day or two later Officer Bezak received a crime alert bulletin regarding a suspect in the Hollywood area. Bezak realized the suspect was appellant. That evening Bezak and his partner returned to the same area near Santa Monica Boulevard where Bezak had seen appellant before. They found appellant at the location and arrested him. Appellant was wearing the shoes he had just stolen from the Payless Shoe store. They still had the security sensor attached. Appellant had a knife on his person when arrested.

A jury convicted appellant of 10 counts of second degree robbery;[1] one count of second degree attempted robbery;[2] one count of carjacking;[3] one count of commercial burglary;[4] one count of auto theft,[5] and one count of petty theft with a prior.[6] The jury found true the allegations appellant personally used a dangerous or deadly weapon.[7] The jury also found true the allegation appellant personally inflicted great bodily injury on Enzo Barbera in committing the robbery alleged in count 10.[8]

Appellant admitted having suffered a strike prior conviction in Florida for what would have been a robbery in California.[9] He also admitted having served a prior prison term as a result of this conviction.[10]

The trial court sentenced appellant to an aggregate term of 51 years and eight months in state prison. He appeals.

## DISCUSSION

### I. *SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S CONCLUSION APPELLANT USED A DEADLY OR DANGEROUS WEAPON IN COMMITTING THE ROBBERIES IN COUNTS 3, 4, AND 6.*

At Sabina's Wigs appellant sprayed Hersco with what she thought was pepper spray. He sprayed the chemical directly into her face and into her eye area. Her eyes started tearing. She could not see. She could not breathe. She was coughing and gasping for air. Her face turned red. She was in such distress that her customer, Javanfard, called 911 and requested paramedics. According to the 911 tape, Javanfard told the operator "come [], come please." "Some man's in there spraying, sprayed them [*sic*]. Sprayed them in the face with something. I don't know. She's screaming and her eyes are burning."

---

[1] Penal Code section 211, counts 1, 2, 3, 4, 5, 6, 8, 10, 15, and 16. All further statutory references are to the Penal Code.

[2] Sections 664 and 211, count 12.

[3] Section 215, subdivision (a), count 7.

[4] Section 459, count 11.

[5] Vehicle Code section 10851, count 13.

[6] Sections 484, subdivision (a) and 666, count 9.

[7] Section 12022, subdivision (b), counts 1, 2, 3, 4, 5, 6, 7, 10, 15 and 16.

[8] Section 12022.7, subdivision (a), count 10.

[9] Section 1170.12, subdivisions (a) through (d), and section 556, subdivisions (b) through (i).

[10] Section 667.5, subdivision (b).

Similarly, at the Ultra Vixen shop appellant sprayed Jenifer Weber in the face in order to make his escape with the loot. Before he sprayed her, Weber saw the canister he used and believed it contained pepper spray. Even though she was wearing glasses, the spray burned her eyes. She also could not breathe for at least 10 minutes. As she told the jury, being unable to breathe for so long was "no joke."

The jury found true the allegation appellant personally used a dangerous or deadly weapon by spraying "an unknown caustic substance" to commit the robberies at Sabina's Wigs and at the Ultra Vixen store in counts 3 and 4. The jury also found true the allegation mace was the dangerous or deadly weapon appellant used to commit the robbery in count 6 by producing a canister and threatening to "mace" Stephen Chapek if he did not comply with his demand for money.

Appellant contends these enhancements are not supported by substantial evidence and must be stricken. First, he notes no reported decision in California holds substances such as tear gas, pepper spray or mace are capable of producing great bodily injury to in turn support a finding they constitute dangerous or deadly weapons. Second, he claims the evidence produced at trial did not demonstrate the spray caused, or was even capable of causing, the requisite significant or substantial injury to warrant a finding the "caustic substance" was a dangerous or deadly weapon to sustain the true findings under section 12022, subdivision (b). He asserts the evidence showed the victims suffered only temporary pain, and thus insubstantial injury. He argues this evidence is insufficient to warrant the findings the substance he sprayed constituted a dangerous or deadly weapon.

■ "In order to find 'true' a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an instrument capable of inflicting great bodily injury or death. . . ."[11] Some objects such as guns, dirks and blackjacks "have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such."[12] In determining whether an object which is not inherently deadly or dangerous has been used as a dangerous or deadly weapon, "the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue."[13]

---

[11] *People v. Wims* (1995) 10 Cal.4th 293, 302 [41 Cal.Rptr.2d 241, 895 P.2d 77]; see also, CALJIC No. 17.16 (personal use of a dangerous/deadly weapon); CALJIC No. 12.42 (deadly weapon—defined).

[12] *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204].

[13] *People v. Aguilar, supra,* 16 Cal.4th 1023, 1029, citing *In re Jose R.* (1982) 137 Cal.App.3d 269, 276, footnote 3 [186 Cal.Rptr. 898, footnote 3] (listing objects such as a

■ The phrase "great bodily injury" as used in section 12022, subdivision (b) means "injury which is significant or substantial, not insignificant, trivial or moderate."[14]

Our research has uncovered no California decision holding substances such as pepper spray, tear gas and/or mace are dangerous or deadly weapons as a matter of law on the ground they are designed to incapacitate victims by affecting the person's vision and respiratory system. Nor have we found any published California decisions that found such substances were dangerous weapons as used in the particular circumstances of the case.[15]

Some courts in other jurisdictions have found chemical substances did not qualify as dangerous weapons because of the peculiar circumstances of the case. For example, in *Austin v. State*,[16] the expert produced by the state testified spraying mace into a victim's mouth would not produce death or serious bodily harm. Because this was the *only* evidence bearing on the issue whether mace was a deadly or dangerous weapon the court found it did not support the finding the crime committed was an aggravated assault rather than a simple assault.[17]

In *United States v. Lancaster*,[18] the court found the trial court did not commit clear error in finding no great bodily injury occurred from the defendant's use of mace. The court noted the victim suffered burning eyes and cheeks, not a wholly trivial injury. However, because the victim suffered no lasting harm, and because the trial court was entitled to apply the rule of lenity in interpreting sentencing provisions, the appellate court upheld the trial court's ruling as not clearly erroneous.[19]

The court in *United States v. Harris*[20] found a brochure stating a competitor's brand had caused a death insufficient, standing alone, to prove mace was

---

pillow, an automobile, a large rock, a razor blade and a fingernail file, which were not deadly per se but were found to be deadly or dangerous weapons under the circumstances).

[14] *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066 [10 Cal.Rptr.2d 839]; CALJIC No. 9.02.

[15] But see, *People v. De La Cruz* (1993) 20 Cal.App.4th 955 [25 Cal.Rptr.2d 202] (chemical mace caused burns and blistering); *People v. Hamilton* (1998) 61 Cal.App.4th 149 [71 Cal.Rptr.2d 359] (discussing statute prohibiting use of a tear gas weapon).

[16] *Austin v. State* (Fla. Dist. Ct. App. 1976) 336 So.2d 480.

[17] *Austin v. State, supra,* 336 So.2d 480, 481–482.

[18] *United States v. Lancaster* (4th Cir. 1993) 6 F.3d 208.

[19] *United States v. Lancaster, supra,* 6 F.3d 208, 210.

[20] *United States v. Harris* (3d Cir. 1995) 44 F.3d 1206.

capable of being used as a dangerous and deadly weapon.[21] Nevertheless, it rejected the *Lancaster* court's interpretation that injuries from substances such as mace must be painful and obvious for a substantial period of time in order to qualify as great bodily injury. "A blow the effects of which can be shaken off in a moment or two may well be an insignificant injury. Blindness, disorientation, breathing difficulty, and extreme discomfort sufficient in combination to induce panic for a period of ten to fifteen minutes are something else entirely and can rationally be viewed as more than an insignificant injury."[22]

The *Harris* court's view of these chemicals' potential to cause harm has been echoed by the vast majority of courts that have considered the issue. Most courts have found tear gas, mace or pepper spray to be dangerous or deadly weapons capable of inflicting great bodily injury. For example, in *United States v. Neill*,[23] the victim suffered from exercise- induced asthma before the incident which she controlled with an inhaler after exercising. A bank robber sprayed her with pepper spray during a holdup. The spray caused her to cough and choke and her eyes and nose to burn. The victim testified she felt as though she was on fire. She could not breathe. After being sprayed she suffered severe asthma attacks for weeks and had to take prescription steroids. The Ninth Circuit concluded the pepper spray had been used as a dangerous weapon.[24]

In *United States v. Bartolotta*,[25] the defendant sprayed a store's employee during a robbery. She developed chemical pneumonia as a result of the spray and was required to take daily steroid shots for over four months and steroid pills for one year to cleanse the mace from her system. The Eight Circuit found the defendant had used mace as a dangerous weapon in committing the crime.[26]

In *United States v. Robinson*,[27] the defendant sprayed bank tellers with mace during a bank robbery. The tellers experienced pain for hours and had residual effects for days. The Seventh Circuit found this sufficient evidence to uphold a sentence enhancement for inflicting bodily injury.[28]

---

[21] *United States v. Harris, supra*, 44 F.3d 1206, 1216.

[22] *United States v. Harris, supra*, 44 F.3d 1206, 1218–1219.

[23] *United States v. Neill* (9th Cir. 1999) 166 F.3d 943.

[24] *United States v. Neill, supra*, 166 F.3d 943, 949–950.

[25] *United States v. Bartolotta* (8th Cir. 1998) 153 F.3d 875.

[26] *United States v. Bartolotta, supra*, 153 F.3d 875, 879.

[27] *United States v. Robinson* (7th Cir. 1994) 20 F.3d 270.

[28] *United States v. Robinson, supra*, 20 F.3d 270, 278.

In *United States v. Dukovich*[29] the defendant sprayed bank tellers with tear gas during a bank robbery. The Eleventh Circuit held tear gas is a dangerous weapon as a matter of law.[30] The court based its holding on evidence: all victims suffered a burning sensation in their faces and throats; some experienced eye pain and severe headaches; the tear gas struck one teller near her eye; two women in the bank were visibly pregnant; tear gas is capable of causing eye damage, vomiting, loss of breath or a rash; and tear gas is potentially harmful to pregnant women.[31]

In *People v. Elliott*,[32] the court found the pepper spray the defendant used in committing the bank robbery constituted a dangerous weapon. "Although there was testimony that the effects of pepper spray are normally temporary, there is no question that its effects are disabling. Both victims testified that after the spray was used, they had difficulty breathing and their eyes burned. One of the victims stated that the spray made her feel nauseated. They were both temporarily incapacitated by the effects of the spray. These effects did not wear off completely until several hours after the robbery. The victims suffered injury and the fact that the injuries were not permanent does not change our conclusion."[33]

In *People v. Norris*,[34] the defendant used a combination of pepper spray and tear gas in a jewelry store robbery. The store's employees suffered extreme eye pain and eye irritation, burning sensations on the skin and in the nose, mouth and lungs, and had breathing difficulties. One of the victims suffered a cornea defect in both eyes consistent with having been chemically sprayed. The court found the chemical spray constituted a dangerous weapon.[35]

In *Pitts v. State*,[36] the defendant threatened to use mace in committing a robbery. The Court of Criminal Appeals found the threatened use of mace sufficient evidence the defendant had used a dangerous weapon. The court noted, "Unquestionably, mace is a substance which is designed as a defensive weapon, but may be used in such a manner as to cause great bodily harm."[37]

---

[29] *United States v. Dukovich* (11th Cir. 1994) 11 F.3d 140.
[30] *United States v. Dukovich, supra*, 11 F.3d 140, 142.
[31] *United States v. Dukovich, supra*, 11 F.3d 140, 142.
[32] *People v. Elliott* (1998) 299 Ill.App.3d 766 [702 N.E.2d 643, 234 Ill.Dec. 303].
[33] *People v. Elliott, supra*, 299 Ill.App.3d 766, 773.
[34] *People v. Norris* (1999) 236 Mich.App. 411 [600 N.W.2d 658].
[35] *People v. Norris, supra*, 236 Mich.App. 411, 418–419.
[36] *Pitts v. State* (1982) 1982 OKCR 121 [649 P.2d 788].
[37] *Pitts v. State, supra*, 649 P.2d 788, 791.

■ Whether appellant used the spray as a dangerous weapon capable of inflicting great bodily injury was a question for the jury to decide.[38] While Hersco did not require hospitalization, her condition was sufficiently alarming to prompt paramedics to arrive. She was screaming in pain. Her eyes were burning and she could not see. She could not breathe and was coughing and gasping for air and her face turned red. Weber suffered similar effects. Her eyes burned. She could not breathe at all for 10 minutes. Appellant's threat to "mace" Chapek was enough to convince him to comply with appellant's demand for money.

In our view, this evidence demonstrates the victims suffered substantial, though transitory, respiratory distress, burning sensations and blindness. This evidence demonstrates the chemical spray was capable of, and did, inflict serious bodily injury in the present case. In light of the examples in the decisions discussed above, it takes little imagination to picture the more serious injuries these victims were fortunate to escape, such as burns, chemical pneumonia, cornea damage or serious asthma attacks.

■ The evidence in the present case also establishes appellant intended to, and did, use the chemical spray to immobilize and temporarily disable his victims in order to escape with the loot. Evidence of these circumstances in combination supports the jury's reasonable deduction appellant used the chemical spray as a dangerous weapon in committing the robberies. Accordingly, the enhancements imposed for having used the chemical spray as a dangerous weapon in committing the robberies in counts 3, 4 and 6 need not be reversed for insufficient evidence.[39]

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[38] *People v. Wims, supra,* 10 Cal.4th 293, 303; *People v. Armstrong, supra,* 8 Cal.App.4th 1060, 1066.

[39] *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].

*See footnote, *ante,* page 678.

## DISPOSITION

The judgment is modified to strike the one-year sentence enhancement imposed under section 667.5, subdivision (b) for having served a prior prison term. The clerk of the Superior Court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections. In all other respects, the judgment is affirmed.

Woods, J., and Zelon, J., concurred.

On April 16, 2004, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 16, 2004.