Filed 6/22/15  P. v. Yun CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B254406 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA085171) |
| v. | |
| CHONG YUN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie E. Brown, Judge.  Affirmed.

Chirstine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Chong Yun of resisting an executive officer (Pen. Code, §§ 69;[1] count 1), false imprisonment by violence (§ 236; count 2), misdemeanor battery (§ 243, subd. (e)(1); count 3), and misdemeanor child cruelty (§ 273a, subd. (b); count 4). The jury found that defendant personally used a knife as to count 1. (§ 12022, subd. (b)(1).) The trial court sentenced defendant to a total of three years in prison.

On appeal, defendant contends that the trial court committed reversible error by denying his request to modify a jury instruction relating to count 1. Defendant argues that the jury should have been instructed that the prosecution had the burden of proving that all officers involved in his arrest were lawfully performing their duties. Defendant further contends that there was insufficient evidence to support the true finding on the use of a deadly or dangerous weapon enhancement, and he requests an independent review of the trial court's in camera hearing on a *Pitchess* motion.[2]

We affirm.

## FACTS

### Prosecution

#### Counts 2 and 3

In September 2013, defendant was living with his wife, Candice, and their four children in an apartment in West Hollywood. Defendant had recently been served with divorce papers.

On the afternoon of September 4, 2013, Candice and defendant sat in their room on the bed, with the door closed, talking about how they were going to move forward with the divorce. Defendant insisted that they should not divorce, and that they could work out their problems. Candice replied that she had made up her mind to divorce, and she only wanted to discuss financial and living arrangements.

---

[1]     All further statutory references are to the Penal Code unless stated otherwise.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

When defendant continued to insist that they not divorce, Candice grew frustrated and tried to get up from the bed. Defendant grabbed her in a "bear hug" and pulled her down to his lap. Candice asked defendant to let go and tried to stand up again, but defendant pulled her down. Defendant continued to hold her across her chest. She tried to stand up five or six times but defendant would not release his grasp. When Candice eventually told defendant that if he talked she would listen, he loosened his grip and allowed her to sit next to him.

After defendant talked for a while, Candice stood up to leave the room. Defendant blocked her way, put his hands on her shoulders, pushed her down on the bed, and pulled off her skirt. Candice felt scared and told him to stop. She tried pushing him away, but he pulled off her blouse. Candice sat on the bed, unwillingly, in her underwear, feeling like she was not free to leave.

Eventually, she got up, went into the bathroom, and closed and locked the door. She stayed in the bathroom for five to 10 minutes. After she composed herself, she opened the door, grabbed her clothes, and put them back on. She asked defendant if she could leave the bedroom, and he said, "No. We're not done with this conversation." She kept asking to leave, however, and when defendant did not block her way to the door, she left the bedroom.

Candice picked up her purse and asked the children if they wanted to go for a walk. Defendant came out of the bedroom and told her she could not leave. He grabbed her arm and pulled her away from the front door. Candice tried to leave again, but he grabbed the strap of her purse, trying to pull her back. She rotated her shoulder so the purse fell off, ran out the front door, and went to a neighbor's apartment. As she left, she heard defendant say, "Candice, I swear to God, if you leave, I'm taking the kids."

At the neighbor's apartment, Candice called 911. She told the operator that defendant hurt her by grabbing and twisting her arm. When asked whether defendant had any weapons, Candice replied that defendant carried a pocket knife in his pocket at all times.

Counts 1 and 4

On the afternoon of September 4, 2013, Deputy Sheriff Alfred Alcala was on patrol with his partner, Deputy Jaime De La Cerda, when they received a call stating that a man and woman were arguing, and the man had a knife in his possession. A later update to the call said the man was leaving with his children. Deputies Alcala and De La Cerda met Deputies Jorge Calvillo and Diep Le at the apartment building. While the four deputies discussed the call, they saw defendant in the building's garage, walking with his four children. The deputies entered the garage and walked toward defendant. Defendant yelled at his children to get in the family's minivan.

Defendant looked at the deputies and yelled, "Fuck off. Get out of here. Leave me alone." Deputy Alcala asked defendant to calm down and speak with them. Defendant reacted negatively and angrily. After repeatedly refusing to speak with the deputies, defendant picked up his son, age four. Deputy Alcala told defendant to put the child down, but defendant refused and continued yelling profanities. By this time, the other three children were in the van. Still holding his son, defendant jumped into the backseat part of the van through the passenger-side sliding door. As defendant threw himself into the van, his son's head hit the top of the door frame.

Deputy De La Cerda opened the driver-side sliding door. He removed one of the children from the van. Deputy Alcala went to assist Deputy De La Cerda, while Deputies Le and Calvillo remained on the passenger side. Defendant was sitting or lying on the floor of the van behind the two front seats. He held his son between his legs and was squeezing his legs together. Defendant's son was crying and his face appeared red.

Deputies Alcala and De La Cerda grabbed defendant's right arm. They told him to put his arms behind his back, but he resisted by tensing up and twisting his body from side to side.

Defendant still had his son scissored in between his legs, and it did not seem like an accident. Deputy Alcala and the other officers told defendant to let go of his son, but defendant refused to comply. Deputies Calvillo and Le grabbed defendant's legs and tried to pry them open but were unsuccessful. Defendant continued struggling and

4

resisting, despite orders to stop fighting and to calm down. Deputy Le grabbed defendant's left arm and pinned it back toward the driver's seat, while Deputy Calvillo punched defendant twice in the face. After that, Deputies Le and Calvillo were able to pry defendant's legs open and grab defendant's son. Deputy Le picked the child up, carried him toward the garage exit, and handed him off to a waiting officer.

After that, defendant appeared to grow even angrier, and started to put up even more resistance. Deputy Alcala continued to grab his arm and again ordered him to put his arms behind his back. Defendant refused and Deputy Alcala sprayed pepper spray in defendant's face. Defendant continued to resist, however, and was able to break free from Deputy Alcala's grip. He pulled a pocket knife out of his right pant pocket and snapped it back and forth, but the blade did not open. Deputy De La Cerda grabbed the arm holding the knife, and Deputy Alcala struck the knife from defendant's grasp, causing the knife to fall onto the ground. The officers were then able to gain control of defendant's arms, and they handcuffed him while Deputy Le removed the other two children from the van.

Deputy Alcala had not seen the knife prior to defendant's pulling it out, and did not recall seeing the knife clip on the outside of defendant's pocket. The knife was a kind that could be opened by a flick of the wrist, but Deputy Alcala found that, due to rust, the knife took a reasonable amount of effort to open with two hands.

When the son of Candice and defendant was returned to Candice after the incident, his foot was swollen and he had an ice pack on it.

**Defense**

Defendant testified that while he and Candice were in their bedroom on September 4, 2013, Candice took off her skirt and fussed with her shirt. Candice needed help with the zipper and defendant helped her remove her shirt. As they sat on the bed talking, Candice wore only her undergarments.

Defendant had looked at the couple's bank account information and noticed there was money missing. He asked Candice about it and she seemed irritated. The couple did not discuss divorce—defendant had known for two months that Candice wanted a

5

divorce. Instead, they talked about defendant's leaving the apartment. Defendant was hurt and upset that Candice wanted him to leave the apartment, because he thought she would allow him to stay until he finished his schooling. He was also anxious and upset about the pending divorce.

As Candice and defendant stood up, defendant reached over and tried to give her a hug and a kiss. Candice pulled away and stepped back, bumping into the bed and falling onto it. Defendant did not push her. They laughed about her falling and defendant cuddled with her. Candice started crying and went into the bathroom. Defendant did not try to stop her or prevent her from getting up from the bed. When Candice came out of the bathroom, she suggested they go to the living room.

In the living room, Candice sat on the couch and defendant sat on the floor. Defendant noticed a text message on Candice's cell phone from her mother stating, "Is it done yet? Call me if you need me." He took her phone and her purse into the bedroom and noticed there was cash in her wallet. He asked Candice what her mother meant by the text message and where she got the money. Candice got upset and asked for her purse and phone, which defendant gave her. She told the children to put their shoes on to leave with her. Defendant told her he was going to take the children to his father's house. As Candice was leaving, defendant reached for her hands, but she pulled away. He grabbed her purse strap and tried to plead with her to stay, but she dropped her purse and walked out.

Defendant grew concerned and told the children that they needed to go with him to look for their mother. He drove with the children around the neighborhood but could not find Candice. He and the children went back to the apartment building. Defendant went up to the apartment to check for Candice but did not find her there, so he and the children walked back out to the van.

As the children got into the van, defendant heard somebody calling. He noticed the officers outside of the garage gate, coming into the garage. Defendant picked up his son to help him into the van as the officers approached. Deputies Alcala and Le asked questions, which defendant answered.

6

The officers asked defendant to put his son down. Defendant turned to put his son in the van when the officers rushed toward him. Defendant was surprised and turned back around, and saw Deputy Calvillo walking quickly toward him with his gun drawn.

Deputy De La Cerda opened the driver-side sliding door and grabbed A., which scared defendant. Defendant, still holding his son, turned back again and hit his shin on the van's door frame. When defendant turned, Deputy Calvillo came up behind him and shoved him into the van.

Defendant ended up sideways on the floor, with his son between his legs and the seat. The space was very cramped. Defendant tried to get up, but his foot got caught in the seat belt. Deputy Calvillo entered the van and immediately struck defendant in the face. Deputy Calvillo got on top of defendant and defendant tried to turn over. Deputy Calvillo continued to punch him in the face, arms, and ribs.

Defendant felt his son, who was crying, being tugged. Defendant told the officers to stop because they were hurting the child. Defendant was stuck between the seats but was trying to help free his son, who was also stuck. Defendant was pepper sprayed in the face and ear. One of the officers then got defendant's foot free of the seat belt and defendant was able to help his son get out.

An officer asked defendant to surrender his knife. Defendant pulled his knife out of his pocket and tried to hand it over. He did not try to open the knife. After the knife was taken away, defendant was handcuffed in the van.

Defendant's daughter, who was eight years old at the time of the incident, testified that when they were in the van, the officers approached. Her father was on the floor of the van. He did not say any bad words. Instead, he asked the officers if they wanted the knife and said, "Do you want the knife? I'll give it to you."

**Rebuttal**

Candice testified that the blouse she was wearing did not have a zipper.

Officer Calvillo testified that he did not have his gun drawn when he approached the van. He did not shove defendant into the van. He saw defendant holding his son while defendant lunged into the van. When in the van, defendant crossed his legs around

7

the child and was squeezing him, making him cry. The child looked like he was going to pass out, so Deputy Calvillo punched defendant in the face three times. Defendant still did not release his son, and Deputy Calvillo screamed, "The baby's not breathing." Deputy De La Cerda pulled defendant, and the officers were able to free defendant's son.

## DISCUSSION

### I. Denied modification of jury instruction

#### A. Denial of the proposed modification

Defendant was charged in count 1 with unlawfully attempting by means of threats and violence to deter and prevent Deputy Alacala from performing his duty, and knowingly resisting Deputy Alcala by the use of force and violence.

Section 69 states: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

The jury received two instructions directly pertinent to this charge. The first, CALCRIM No. 2652, read: "The defendant is charged in Count 1 with resisting an executive officer in the performance of that officer's duty in violation of [] section 69. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant unlawfully used force or violence to resist an executive officer; [¶] 2. When the defendant acted, the officer was performing his lawful duty; [¶] AND [¶] 3. When the defendant acted, he knew the executive officer was performing his duty. [¶] An executive officer is a government official who may use his or her own discretion in performing his or her job duties. A Los Angeles Sheriff's Department Deputy is an executive officer. [¶] A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone [] or using unreasonable or excessive force in his or her duties. Instruction 2670 explains when an arrest or detention is unlawful [] and when force is unreasonable or excessive."

8

In turn, CALCRIM No. 2670 instructed: "The People have the burden of proving beyond a reasonable doubt that Alfred Alcala was lawfully performing his duties as a peace officer. If the People have not met this burden, you must find the defendant not guilty of Count 1, [] [s]ection 69. [¶] A peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force when making or attempting to make an otherwise lawful arrest or detention. [¶] A. Unlawful Detention [¶] A peace officer may legally detain someone if the person consents to the detention or if: [¶] 1. Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is, or is about to be involved in activity relating to crime; [¶] AND [¶] 2. A reasonable officer who knew the same facts would have the same suspicion. [¶] Any other detention is unlawful. [¶] In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she detained the person. [¶] C. Use of Force [¶] Special rules control the use of force. [¶] A peace officer may use reasonable force to arrest or detain someone, to prevent escape, to overcome resistance, or in self-defense. [¶] If a person knows, or reasonably should know, that a peace officer is arresting or detaining him or her, the person must not use force or any weapon to resist an officer's use of reasonable force. However, you may not find the defendant guilty of resisting arrest if the arrest was unlawful, even if the defendant knew or reasonably should have known that the officer was arresting him. [¶] If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest or detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself. [¶] A person being arrested uses reasonable force when he or she: (1) uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and (2) uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection."

Prior to the reading of instructions, defendant's counsel argued that CALCRIM No. 2670 should reference not only Deputy Alcala, but also the other three officers

9

involved in defendant's arrest. Defendant's counsel contended that, during defendant's arrest, he reacted to excessive use of force by all four deputies. The trial court initially appeared to agree with defendant's proposed modification. The prosecutor, however, argued that if the jury was going to consider the actions of all four officers in making the arrest, it should also consider that defendant resisted all four officers, and that there should be four counts of violating section 69. The trial court agreed with this argument, and asked defendant's counsel whether—in the event that CALCRIM No. 2670 referenced all four deputies—he would agree to an amendment of the information to conform to proof and state a separate count for each officer. Defendant's counsel did not agree, and he withdrew his request for modification. He asserted, however, that he "should not be precluded from arguing the totality of the circumstances," to which both the prosecutor and the trial court assented. Nevertheless, defendant's counsel continued to object to the denied modification of the jury instruction.

B. Analysis

Defendant contends that the proposed modification of CALCRIM No. 2670 was proper, and that the trial court's denial of the modification violated his right to due process and prevented him from presenting a complete defense.

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'" (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) While a trial court need not go beyond these general instructions in the absence of a request, a defendant is entitled to an instruction that pinpoints his theory of the case, if he or she so requests. (*People v. Gurule* (2002) 28 Cal.4th 557, 660.) A proposed instruction may be refused however, if it is an incorrect statement of the law or is argumentative or duplicative. (*Id.* at p. 659) Moreover, an instruction that might confuse the jury should be refused. (*Ibid.*)

On appeal, defendant contends that CALCRIM No. 2670, as given by the trial court, allows the prosecution to choose one officer who used a reasonable amount of force to sustain a conviction, even while other officers acted unlawfully. Defendant argues that in a situation where multiple officers used force against the defendant, the trier of fact should determine whether any officer first used unreasonable or excessive force. Otherwise, according to defendant, he "could be charged with resisting a lawful officer by responding to an unlawful officer's actions."

The People argue that the trial court properly declined the proposed modification of CALCRIM No. 2670 because it could confuse the jury. We agree. The modification sought by defendant's attorney would have modified the first sentence of the instruction so that it read: "The People have the burden of proving beyond a reasonable doubt that Alfred Alcala, Diep Le, Jorge Calvillo, and Jaime De La Cerda were lawfully performing their duties as peace officers." The problem with this proposed instruction is that it could lead the jury to believe that, in order to find defendant guilty of resisting arrest by Deputy Alcala, it would first need to find that all four deputies acted lawfully. For example, under a scenario where the evidence showed that defendant initially resisted arrest by tensing up and twisting when grabbed by Deputy Alcala, and thereafter a different deputy used unlawful force against defendant, the proposed modification could lead the jury to believe that the later unlawful act nullified the initial act of resistance.

If CALCRIM No. 2670 were modified to reference all four officers, the most straightforward means of mitigating this potential for confusion would be to amend the information to state four counts of resisting arrest, as proposed by the prosecutor and the trial court. Defense counsel rejected this offer—which was probably wise. Nevertheless, under these circumstances, where the proposed modification likely would have confused the jury, and defendant's counsel refused to stipulate to amendment of the information so that it more closely aligned with the proposed modification, we cannot find error on the part of the trial court.

Even if there was error, however, it was harmless. (See *People v. Anderson* (2015) 232 Cal.App.4th 1259, 1280, citing *People v. Breverman* (1998) 19 Cal.4th 142,

11

178 [instructional error reversible only if reasonable probability error affected the outcome].) During closing argument, defendant's counsel repeatedly argued that all four officers acted improperly—that they used "excessive force" and overreacted—and counsel referred to Deputy Calvillo as a "loose cannon." Meanwhile, the prosecutor never asserted that the jury could disregard any of the four officers' behavior. Instead, she argued that all officers acted properly. Moreover, there was strong evidence supporting the People's case, and the jury's verdict shows they uniformly believed the officers' testimony and not defendant's. Thus, a modified version of CALCRIM No. 2670 would not have changed the outcome.

## II. Weapon enhancement

Defendant argues that there was insufficient evidence to support the true finding on the enhancement for use of a deadly or dangerous weapon. Section 12022, subdivision (b)(1) provides: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." A true finding must be supported by evidence that, during the crime or attempted crime, the defendant intentionally displayed in a menacing manner, or stuck someone with, an instrument capable of inflicting great bodily injury or death. (*People v. Wims* (1995) 10 Cal.4th 293, 302; *In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 322.)

Deadly weapons can include objects which "may be used as weapons but which have nondangerous uses, such as hammers and pocket knives." (*People v. Burton* (2006) 143 Cal.App.4th 447, 457.) "In determining whether an object which is not inherently deadly or dangerous has been used as a dangerous or deadly weapon, 'the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.'" (*People v. Blake* (2004) 117 Cal.App.4th 543, 555.)

We find that the jury's true finding was supported by substantial evidence. Deputy Alcala testified that defendant, while struggling with the officers, pulled the pocket knife from his pocket on his own volition and visibly snapped it several times, in a

12

manner used to open a foldable knife. Although the knife did not open, it was capable of being opened. Further, defendant testified that he used the knife to cut drywall. Thus, the jury had a reasonable basis to conclude that defendant intentionally displayed the knife in a menacing manner, and that the knife was capable of inflicting great bodily injury.

## III. *Pitchess* **review**

Defendant moved for discovery of personnel information relating to the four arresting officers. (*Pitchess*, *supra*, 11 Cal.3d 531.) Defendant requested that this Court independently review the transcript of the *Pitchess* hearing to determine if any additional discoverable materials were withheld.

*People v. Mooc* (2001) 26 Cal.4th 1216, 1229, explains the procedure the trial court should follow in deciding a *Pitchess* motion: "The trial court should . . . make a record of what documents it examined before ruling on the *Pitchess* motion. Such a record will permit future appellate review. . . . Without some record of the documents examined by the trial court, a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent. Of course, to protect the officer's privacy, the examination of documents and questioning of the custodian should be done in camera in accordance with the requirements of Evidence Code section 915, and the transcript of the in camera hearing and all copies of the documents should be sealed."

We independently reviewed the sealed reporter's transcript of the in camera hearing. The trial court's statements during that hearing, however, were insufficient to permit appellate review of its findings.

Accordingly, on March 10, 2015, we notified the trial court that the record failed to adequately identify and describe each personnel document that was withheld and not produced. We requested that it augment the record to include copies of all documents reviewed in camera.

We have now received copies of the personnel documents inspected by the trial court. Our independent review reveals that the trial court properly exercised its

discretion, and its order concerning the disclosure of materials to the defense was correct. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 827 [trial court's ruling on a motion to discover personnel records is reviewed for abuse of discretion].)

## **DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.