Filed 9/25/20  P. v. Dapremont CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PERRY ANTHONY DAPREMONT,<br><br>    Defendant and Appellant. | B299366<br><br>(Los Angeles County<br>Super. Ct. No. TA145438) |

—————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

—————————

A jury convicted Perry Anthony Dapremont of first degree murder (Pen. Code,[1] § 187), and found true the special circumstance allegations that the murder involved the infliction of torture (§ 190.2, subd. (a)(18)) and the use of a deadly and dangerous weapon (§ 12022, subd. (b)(1)). The trial court sentenced Dapremont to serve life in prison without the possibility of parole, plus one consecutive year for the deadly weapon enhancement.

Dapremont appeals, arguing insufficient evidence supported the jury's finding that his killing was premeditated and deliberate. He also challenges the special circumstance finding that the killing involved the infliction of torture because insufficient evidence supported the jury's finding that he acted with the requisite intent. He also challenges the sufficiency of the evidence for the deadly weapon enhancement; alleges the prosecutor committed prejudicial misconduct in his closing argument; and argues that the trial court abused its discretion by refusing the jury's request for a readback of the prosecutor's closing arguments.

We affirm. Sufficient evidence supports the jury's finding Dapremont acted with premeditation and deliberation when he killed his victim. Dapremont pummeled his victim's face, knocked out her front teeth, attacked her with a metal pipe, broke her arm (inflicting a non-defensive wound), and crushed her rib cage, causing her to slowly suffocate. Every injury was inflicted prior to death, with the exceptions of abrasions to her knees (likely caused by dragging her body across the concrete on his way to dumping her naked body onto the curb) and the insertion of cloves of garlic into her mouth and anus. This brutal manner of killing, together with evidence of planning and motive, is sufficient evidence from which

_____

[1] Subsequent undesignated statutory citations are to the Penal Code.

the jury could reasonably have concluded Dapremont killed with premeditation and deliberation. This manner of killing is also sufficient evidence supporting the torture enhancement.

Dapremont's remaining arguments are without merit.

## FACTUAL AND PROCEDURAL BACKGROUND

The basic facts of this case are uncontested. There is no question Dapremont killed Antonia Rubio-Delgadillo. The only questions involve the circumstances under which the murder occurred—that is, whether it was premeditated and deliberate.

Rubio-Delgadillo was last seen on February 14, 2018, in the parking lot of the Big 5 Sporting Goods store on Crenshaw Boulevard in Inglewood. The store's surveillance video showed Rubio-Delgadillo walking through the parking lot and approaching various individuals, men and women.

At 10:05 a.m., the video shows Rubio-Delgadillo voluntarily entering Dapremont's motorhome. She was wearing a blue jacket and beanie style hat. She was a small woman, standing four feet 11 inches tall and weighing 82 pounds.

At 10:42 a.m., a video shows the motorhome's door burst open. It swung partially closed, then was pulled shut from the inside. The door then flung open a second time and again pulled shut. Rubio-Delgadillo never exits the motorhome, which drives out of the parking lot a few hours later.

Dapremont drove around South Los Angeles for several more hours, ultimately stopping in the parking lot of a Sit 'n' Sleep warehouse on Main Street in Gardena at 2:12 p.m.

According to surveillance video from the Sit 'n' Sleep warehouse, around 7:30 p.m. on February 15, 2018, Dapremont is seen exiting the motorhome and moving Rubio-Delgadillo's naked body from behind the motorhome, ultimately leaving the body on

the curb. At approximately 9:00 p.m., a passerby discovered the body and called 911.

Sheriff's deputies arrived and found Rubio-Delgadillo's body lying against the curb. She had rigor mortis and was declared dead at the scene by emergency medical personnel.

A California Highway Patrol officer who had arrived prior to the Sheriff's deputies informed them he believed there was a person in the nearby motorhome. A Sheriff's deputy shined his flashlight through the motorhome's windows and saw a hand protruding from under the bed. The deputy called out to the person to exit the vehicle. Dapremont complied and was arrested for murder.

During the investigation of the crime scene, law enforcement discovered Rubio-Delgadillo's blood had stained the concrete outside the motorhome, suggesting the path over which her body had been dragged. Inside the motorhome, investigators found Rubio-Delgadillo's blood on the mattress, on a large tarp in the closet, on a canvas bag in the closet, on the floor in front of the stove and sink, on the edge of the sink, and in the foot well of the passenger-side door.

Investigators also discovered a milk crate on the floor which held the yellow Laker's shirt and a pair of camouflage shorts that Rubio-Delgadillo was wearing on the Big 5 surveillance video. The collar of the shirt was stained with her blood.

A metal pipe was found on the dashboard. Later, the investigation showed it had the DNA of two people. Ninety-seven percent of the blood was from Rubio-Delgadillo, the other 3 percent was from Dapremont.

At the police station Dapremont's body was examined. Investigators discovered blood stains belonging to Rubio-Delgadillo on his left foot and shoe. Rubio-Delgadillo's blood was also found on Dapremont's left toe and bottom left shoe. Dapremont's right hand

was so swollen below the knuckles that the knuckles themselves were not visible.

The coroner, Dr. Timothy Dutra, testified to a series of injuries that Dapremont inflicted upon Rubio-Delgadillo.  He had beaten her entire body, head to toe; pounded her with his fists; struck her with the metal pipe; and crushed her rib cage.

Rubio-Delgadillo's head was lacerated in four areas.  The top of her head bore a three-quarter inch laceration, her forehead had a one-inch laceration, the back of her head had a "complex" laceration comprised of two connecting one-inch and two-inch lacerations, and her right temple bore a one and one-half inch laceration.  "[T]he entire face had bruising or contusions."  The blows to her face and head were so severe they caused bleeding to the surface of her brain.  Her upper front teeth had been knocked out of their sockets.  The dental sockets were hemorrhagic, indicating the teeth were knocked out anti-mortem.  Her face was not recognizable.  Also, her buttocks, the back of her arms, forearms, hands, and lower right leg all bore abrasions and contusions.

Rubio-Delgadillo's right arm had been fractured.  Dr. Dutra explained the arm has two long bones—the radius and the ulna—and it was the radius that was fractured.  A fracture of the radius is not a defensive wound because in a defensive fracture "the person often holds their forearm in front of them, and with the thumb facing them," exposing the ulna to the blow.  A fracture of the radius indicates that the victim was struck with their thumbs facing outward.  This means that Dapremont broke her arm while she was not capable of defending herself.

Although it was the crushing of Rubio-Delgadillo's rib cage that killed her, the brain bleeding also contributed to her death.  Rubio-Delgadillo "had multiple bilateral fractures of both the front and back ribs, segments of the ribs."  This was a "crush injury," Dr.

5

Dutra explained.  When the entire rib cage is crushed, a person's ribs "fracture in two different places, in the front and the back." This makes the rib cage a "flailed chest . . . [s]o that if a person tries to breath[e] in by pulling down on their diaphragm, instead of pulling air through their trachea, they will instead—the chest will sink down."  So when Dapremont crushed Rubio-Delgadillo's ribs, she was being "asphyxiated, suffocated."  Dr. Dutra's examination of the rib fractures revealed they were hemorrhagic, indicating that blood was being pumped into the surrounding tissues.  Rubio-Delgadillo was therefore alive after her ribs were crushed.

Based upon Dr. Dutra's analysis of Rubio-Delgadillo's chest, she was suffocating for "several minutes."  Although this was the "primary" cause of death, her cause of death was "*multiple* blunt force trauma," and the "hemorrhages on the surface of [her] brain" were "other contributing factors."  (Italics added.)

Every injury we have just described was inflicted upon Rubio-Delgadillo while she was alive.

Dr. Dutra testified that because all the above-described injuries were acute, they must have been inflicted within a 12-hour time span.  Dr. Dutra could not offer a professional opinion as to the exact length of time, however.  On cross-examination, Dr. Dutra testified it was possible all these injuries could have been inflicted in as short a period as 10 minutes.  But Dr. Dutra refused defense counsel's invitation to characterize the killing of Rubio-Delgadillo as "not a dragged out incident."

The abrasions on Rubio-Delgadillo's knees were consistent with Dapremont dragging her body across concrete and were inflicted after death.  The autopsy also revealed a bulb of garlic had been inserted into her mouth and another into her anus after death.

Cell phone records showed that on February 14, 2018, Rubio-Delgadillo used her phone a few times in the area of the Big 5 Store

6

until 11:54 a.m.  After that, every call went to voicemail.  Julio Martinez, Rubio-Delgadillo's husband, testified he spoke to her before she left their shared home that morning, and again on the phone later that morning.  When he called her again at lunchtime, and later that day, she did not answer.  Dapremont's last cell phone call on February 14 was at 8:24 a.m., made in the area of the Big 5 store.  He did not use his cell phone again until the next day.

Martinez also testified that when Rubio-Delgadillo left their house that morning she had a full set of teeth.

Dapremont did not testify or present any evidence.

Dapremont timely appealed.

## DISCUSSION

### I.     First Degree Murder:  Premeditation and Deliberation

A.     *Standard of Review*

In reviewing a challenge to the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 67 L.Ed.2d 560].)  "[W]e must ask the same question when we conduct such review under the due process clause of article I, section 15 of the California Constitution."  (*People v. Thomas* (1992) 2 Cal.4th 489, 544 (conc. & dis. opn. of Mosk, J.).)  The quantum of evidence necessary to satisfy this standard of appellate review is the "substantial evidence" standard.  Evidence is " 'substantial' " if it is " 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.'  [Citations.]"  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)

This standard of review is unchanged where, as here, the People rely primarily on circumstantial evidence to prove premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).) So long as a rational trier of fact could conclude the defendant premeditated and deliberated beyond a reasonable doubt, our state and federal Constitutional safeguards are satisfied. (*Ibid.*) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citations.]" (*Ibid.*)

### B. *Applicable Law*

#### 1. First Degree Murder

Murder is in the first degree if the prosecution proves beyond a reasonable doubt that the defendant killed with malice aforethought, intent to kill, premeditation, and deliberation. (§§ 187, 189.)

We have defined " ' "deliberate" ' " as " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*Perez, supra*, 2 Cal.4th at p. 1123.) We have defined " ' "premeditated" ' " as " 'considered beforehand.' " (*Ibid.*)

Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

"[D]irect evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances in the case as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the jury for determination." (*People v. Isby* (1947) 30 Cal.2d 879, 888.)

## 2. The *Anderson* Factors

The parties agree our review is governed by the framework set forth in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*). We also agree.

In *Anderson*, our Supreme Court surveyed prior cases reviewing the sufficiency of the evidence to support findings of deliberation and premeditation. The court identified three categories of evidence relevant to deliberation and premeditation: (1) planning activity, (2) motive, and (3) manner of killing. (*Anderson, supra*, 70 Cal.2d at pp. 26-27.) The court stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing]." (*Id.* at p. 27.)

But our Supreme Court has also cautioned appellate courts that "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)

9

The *Anderson* guidelines are therefore descriptive, not normative.  " 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

Evidence of planning, motive, and manner, in the combinations approved by *Anderson*, "are not elements of the crime of first degree murder." (*People v. Lucero* (1988) 44 Cal.3d 1006, 1021.)  Nor need the *Anderson* factors "be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive." (*People v. Pride* (1992) 3 Cal.4th 195, 247 (*Pride*).)

C.    *Substantial Evidence Supports the Verdict of Premeditated and Deliberate First Degree Murder*

Dapremont contends that we must reverse his conviction because there was no evidence of planning or motive, leaving the jury with a single *Anderson* factor to consider—manner of killing—and that factor standing alone is insufficient as a matter of law to support an inference of first degree murder.[2]  He argues we must reverse his conviction because under *Anderson* the brutality of a killing cannot alone support premeditation and deliberation.  Even a horrifically brutal killing, he argues, such as his killing of Rubio-Delgadillo, is just as consistent with an unconsidered explosion of violence as it is with a premediated and deliberate plan to kill.  (See *Perez, supra*, 2 Cal.4th at p. 1139 [" '[T]he rule has been repeatedly

---

[2] There is an exception to this general rule for "execution-style" murders, such as when the victim is found lying in a ditch in an open field with gunshot wounds to the back of the head.  (See, e.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 956-957.)  In such cases, evidence of "manner" alone may be sufficient.  But this exception is not applicable here.

reiterated by our Supreme Court that "[t]he fact that a slaying was unusually brutal, or involved multiple wounds, cannot alone support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder" ' "].)

Dapremont insists that his killing of Rubio-Delgadillo was just such a "sudden, random 'explosion' of violence": his actions "were made rashly, impulsively, and were unencumbered by one iota of premeditation and deliberation." "All the evidence shows," Dapremont argues, "was [that] Rubio-Delgadillo entered [Dapremont's] RV and 36 hours later, [Dapremont] placed her dead body on the pavement in front of his parked RV." Dapremont "may have killed [Rubio-Delgadillo] within minutes of her entering the RV, or just shortly before placing her body outside the RV" all of which, Dapremont argues, "could have been inflicted as part of one violent outburst lasting as short as 10 minutes."

Dapremont concludes that because our case law demands evidence of planning activity and/or motive, and because there is not evidence of either, we must reverse his conviction.

We disagree. Contrary to Dapremont's contention, there is substantial evidence of both planning and motive. Moreover, we hold the jury could have reasonably inferred premeditation and deliberation from the manner of killing itself.

### 1.    Planning Activity

The first step of Dapremont's *Anderson* argument is to claim there was no evidence of planning. We disagree.

As to planning activity, investigators discovered a "large" blood-covered tarp in Dapremont's motorhome. They also found a metal pipe on the dashboard. Rubio-Delgadillo's blood was found on both. On those bases alone, substantial evidence supports premeditation. A jury could rationally infer that he possessed the

11

pipe for the purpose of attacking his victim and the tarp for preventing blood stains to the interior of his motorhome. The tarp was covered in Rubio-Delgadillo's blood and the pipe bore her DNA.

Our Supreme Court has previously found planning activity was sufficiently evinced by a missing hammer from a toolbox that the defendant "likely" used as the murder weapon. (*People v. Wharton* (1991) 53 Cal.3d 522, 547.) Together with "evidence from which the jury could have reasonably inferred that [the] defendant was also stealing from [the victim] *before* her demise" (*id.* at p. 547), our high court affirmed a conviction for first degree murder even though "the manner of killing was not indicative of a preconceived design to kill." (*Id.* at p. 548.) Possessing a pipe and tarp before committing a brutal murder is even stronger evidence of planning activity than the evidence approved in *Wharton*, and, as we show below, the manner of killing here *was* indicative "of a preconceived design to kill," unlike in *Wharton*.

Dapremont deals with the tarp and pipe evidence solely with the observation: "A person may possess a tarp and a pipe for a slew of reasons wholly unrelated to planning a murder . . . ." As to the pipe: "Perhaps the pipe was there from prior repairs."

These innocent explanations are of course possible. But the question is not whether possessing a tarp and pipe invariably indicates a preconceived plan of murder *in general*, but whether their presence in Dapremont's motorhome immediately *before he commits a prolonged and brutal murder in which he utilized both,* supports an inference of planning activity *under those circumstances.*

The jury may rationally have concluded that Dapremont possessed the tarp and pipe in order to facilitate the murder. In any case, there was other evidence that supported an inference of planning. Dapremont inserted cloves of garlic into Rubio-

Delgadillo's throat and anus. Although these actions were post-mortem, the jury could have rationally inferred that Dapremont's use of the garlic in such a bizarre manner suggested advance planning.

We therefore reject Dapremont's argument there was no evidence of planning activity.

### 2. Motive

The second step of Dapremont's *Anderson* argument is to claim the People offered no evidence of motive. We acknowledge there was no evidence of any prior relationship between Dapremont and his victim. Dapremont is also correct that Rubio-Delgadillo appeared to enter his motorhome voluntarily. However, it does not follow the jury could not have lawfully inferred Dapremont possessed a motive for murder.

We know Rubio-Delgadillo entered the motorhome voluntarily, but she never left alive. At some point their consensual encounter turned violent. Before Dapremont killed Rubio-Delgadillo, he committed lesser included felonies, including assault with a deadly weapon—likely striking her on the head with the pipe multiple times causing her brain to bleed. Dapremont also broke Rubio-Delgadillo's arm, and the jury may have inferred he used the pipe to do that as well. The coroner testified these injuries were anti-mortem. He also punched her face repeatedly and knocked out her front teeth. Once Dapremont began to inflict any one of these injuries upon Rubio-Delgadillo, he acquired a motive to kill her: he had a motive to kill the only witness to a felonious assault. Indeed, there was video evidence that showed the motorhome door fly open and be pulled shut—*twice*—in the Big 5 parking lot. The jury may have rationally inferred that Rubio-Delgadillo was trying to escape, and that Dapremont overpowered her to keep her inside so that he could kill her. That is enough evidence of motive.

13

Our Supreme Court has approved postulating motive evidence in the form of silencing a witness to their own assault during *Anderson* review. For instance, in *People v. Bonillas* (1989) 48 Cal.3d 757, 792, the court held: "Although there was no evidence of planning activity with respect to the killing, there was evidence of motive. The victim was [the] defendant's neighbor and would easily have been able to recognize and identify [the] defendant as the perpetrator of the burglary." (See also *People v. Haskett* (1982) 30 Cal.3d 841, 850.)

This reasoning applies with equal force here, and thus we hold there was evidence of motive.

In addition, as mentioned earlier, Dapremont placing garlic into Rubio-Delgadillo's mouth and anus suggests that he had a motive for killing her, although the exact motive may be unclear. Such bizarre and disrespectful treatment of the victim's body, combined with the brutality of the killing, however, suggests that he had some kind of grudge against her and that the killing was for revenge.

### 3.     Manner of Killing

We now turn to manner of killing. As we indicated above, this section serves two purposes. First, it completes our *Anderson* review. Because this case presents evidence of all three *Anderson* factors—planning, manner, and motive—our case law demands we affirm Dapremont's conviction of murder in the first degree. Second, this subsection demonstrates that the evidence of the manner of killing is so indicative of premeditation and deliberation, that we may also affirm the jury's verdict on the basis of this evidence alone.

The manner of Dapremont's killing was brutal, both in force and in duration. Dapremont's papers repeatedly emphasize Dr. Dutra's admission that Dapremont could have inflicted all the blows

14

upon Rubio-Delgadillo in a "violent outburst lasting *as short as 10 minutes*." Yet Dapremont cites no authority establishing that if he spent "only" 10 minutes beating, breaking, and crushing an 88-pound woman to death, he must have acted without premeditation and deliberation. In fact, our cases require a contrary conclusion.

California appellate courts have affirmed first degree murder convictions predicated primarily on evidence of the manner of killing when the manner is highly indicative of premeditation and deliberation in three threads of cases: (i) where the defendant changes weapons; (ii) where the killing itself involves the infliction of many non-lethal injuries; and (iii) where the killing involved strangulation. We briefly review these three lines of cases to show that their reasoning applies here.

First, we review the changing weapons cases. When a defendant reloads a gun or retrieves a second knife after the first knife breaks, the jury may lawfully infer the defendant had time to consider his or her actions and return a verdict for first degree murder. (See *Perez, supra,* 2 Cal.4th at p. 1127 [evidence the defendant retrieved second knife from kitchen when first knife broke "bears similarity to reloading a gun or using another gun when the first one has run out of ammunition" and supported inference of premeditation and deliberation]; *People v. Bjornsen* (1947) 79 Cal.App.2d 519, 529-530 [reloading a single-barreled shotgun].)

As in the changing weapons cases, Dapremont used *at least* two weapons on Rubio-Delgadillo: a metal pipe and his fists. He also crushed her rib cage. And although there was no evidence of how he crushed her rib cage, the jury may have rationally inferred he used a *third* killing method, such as stomping on her chest, in order to inflict such an injury.

15

We review the evidence here. Dr. Dutra testified that "the primary, the most important mechanism of injury which resulted in her death" was Dapremont crushing Rubio-Delgadillo's rib cage. Once Dapremont crushed her rib cage, Rubio-Delgadillo had three minutes to live. Even if we accept that the killing took the 10 minutes Dapremont believes helps his case, this implies he was alternately beating and striking Rubio-Delgadillo with a metal pipe and his fists (in some combination) for at least seven minutes. In other words, he could not have started his murder by crushing Rubio-Delgadillo's rib cage because she would have died three minutes later leaving insufficient time for him to inflict the remaining, multiple anti-mortem injuries. Dr. Dutra testified Rubio-Delgadillo's broken arm was not a defensive wound. This means that he struck her while she was standing (with her arms to her aside) or lying down face-up. Dapremont used his fists to beat her and a pipe to strike her before he inflicted the "primary" cause of death.

Thus, just as in the changing weapons cases, Dapremont "changed weapons" here. He alternated between striking her with a metal pipe and crushing her rib cage using the weight of his body. The interval between striking her with the pipe and crushing her rib cage provided a sufficient opportunity for Dapremont to reflect on his actions, and so, also provided the jury with sufficient evidence to infer premeditation and deliberation.

Second, our cases have found evidence of the manner of killing sufficient to support a jury finding of premeditation and deliberation on the basis of the sheer number of injuries inflicted upon the victim. For example, in *People v. San Nicolas* (2004) 34 Cal.4th 614, our Supreme Court affirmed a first degree murder conviction against an *Anderson*-based challenge holding "[t]he jury also fairly could have concluded that [the] defendant was intent

16

upon killing [the victim] due to the sheer number of wounds on [the victim's] body" (*id.* at p. 658), which included "multiple stab wounds in her chest and back, and a linear defensive cut on her left wrist." (*Id.* at p. 627.)  Likewise, in *Pride*, *supra*, 3 Cal.4th 195, the manner of killing evidenced reflection.  The victim was stabbed 18 times, there were no defensive wounds, and other evidence suggested the defendant attacked the victim while she was pinned to the floor.  The court observed "[t]he jury could infer [the] defendant pinned [the victim] down or otherwise rendered her helpless before the stabbing began."  (*Id.* at p. 248.)  Thus, "a rational trier of fact could conclude [the] defendant premeditated and deliberated [the victim's] death."  (*Ibid.*)  Finally, in *People v. Elliot* (2005) 37 Cal.4th 453 (*Elliot*), our Supreme Court affirmed a first degree murder conviction where the victim suffered three potentially fatal knife wounds, and almost 80 additional stab and slash wounds.  The court held "[t]he jury could have construed the repeated slashing of [the victim's] throat, in connection with the dozens of other wounds, as intimating a preconceived design to kill."  (*Id.* at p. 471.)

We have already reviewed the sheer number of injuries Dapremont inflicted upon Rubio-Delgadillo and need not repeat them in detail here.  Just as in *Elliot* and *Pride*, Dapremont inflicted injuries to Rubio-Delgadillo's entire body: she was covered in bruises and lacerations, had a broken arm, and knocked out teeth.  The blows were so violent and numerous that her facial features were obliterated.  A diagram also shows a front and back outline of a human body, on which Dr. Dutra made marks indicating injuries of one kind or another on every single region of Rubio-Delgadillo's body.

Third, our cases have affirmed first degree murder convictions predicated primarily on evidence of manner of killing

alone when the manner of killing is strangulation. This is because strangulation is an inherently "prolonged manner of taking a person's life [and] requires an offender to apply constant force to the neck of the victim[;] [this manner of killing] affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020.) Similarly, in *People v. Lewis* (2009) 46 Cal.4th 1255, the court stated that "[e]ven if the initial strangulation was spontaneous," as the defendant argued on appeal, the jury nevertheless lawfully returned a conviction for first degree murder because "the additional act of slashing [the victim's] throat 'is indicative of a reasoned decision to kill.' [Citation.]" (*Id.* at p. 1293.)

Just as in the strangulation cases, even if Dapremont's initial assault was spontaneous—and so unaccompanied by premeditation and deliberation—his subsequent assaults were no longer spontaneous because one of those acts involved suffocation. And killing by suffocation is inherently a "prolonged manner of taking a person's life." (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1020.)

### 4.    Post-killing Behavior

Finally, we have held that a defendant's behavior *after* a murder can negate (or enhance) an inference of premeditation and deliberation. (See *People v. Boatman* (2013) 221 Cal.App.4th 1253.)

Here Dapremont's conduct after the murder also supports planning and motive. After he killed Rubio-Delgadillo, Dapremont put her clothes in a bag, inserted garlic into her anus and mouth, and stayed in his motorhome with her dead body for 36 hours. He then dumped her naked body onto a curb and waited inside his motorhome until a passerby called the police after seeing the body.

This behavior is akin to the defendant's post-killing conduct in *Perez*, where our Supreme Court found the defendant remaining at the scene in order to search the victim's home for items to steal

18

and to change the bandage on his hand, further supported the jury's finding of premeditation and deliberation. (*Perez, supra,* 2 Cal.4th at p. 1128.) In contrast, this behavior is entirely unlike that of the defendant's in *Boatman* where after accidentally shooting his girlfriend, the defendant "tried to resuscitate [the victim] and directed his brother to 'call the cops,' [and] could be heard crying in the background during the 911 call." (*People v. Boatman, supra,* 221 Cal.App.4th at p. 1267.) The Court of Appeal held this behavior "not only fails to support an inference of a plan to kill [the victim], but strongly suggests *a lack* of a plan to kill." (*Ibid.*)

We conclude substantial evidence supports the jury's finding that Dapremont either premeditated to kill Rubio-Delgadillo at some time before he began to assault her or that he formed the requisite intent at some point during his 10 minutes to many hours-long beating that led to her death.

## II.    Special Circumstance Torture-murder Enhancement

Dapremont also claims there is insufficient evidence to support the jury's torture-murder special circumstance finding because the People introduced no evidence of intent to torture.

We review this challenge for substantial evidence. (See *People v. Chatman* (2006) 38 Cal.4th 344, 389 ["The same standard of review applies in considering circumstantial evidence and the support for special circumstance findings"].)

Reviewing the entire record in the light most favorable to the prosecution (see *Jackson v. Virginia, supra,* 443 U.S. at p. 319), we conclude a rational trier of fact could have found true beyond a reasonable doubt the essential elements of the torture-murder special circumstance allegation.

### A.    *Applicable Law*

Proof of torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant

intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim.  (*People v. Davenport* (1985) 41 Cal.3d 247, 271.)[3]

The jury may infer the requisite " 'torturous intent' " " 'from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.  [Citation.]'  [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1187, fn. omitted.)

Torturous intent " 'is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.'  [Citation.]" (*People v. Smith* (2015) 61 Cal.4th 18, 52.)

"[E]vidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite

---

[3] Note that this is a distinct crime from *murder by torture* criminalized at section 189, subdivision (a).  "Murder by torture requires (1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent." (*People v. Edwards* (2013) 57 Cal.4th 658, 715-716.)

The torture-murder special circumstance is thus distinguished from first degree "murder by torture" in that it requires a defendant to have acted with the intent to kill and applies where the death involved the infliction of torture, regardless of whether the acts constituting the torture were the cause of death. (See § 190.2, subd. (a)(18); *People v. Bemore* (2000) 22 Cal.4th 809, 842-843.)

' " sadistic intent to cause the victim to suffer pain in addition to the pain of death." ' [Citations.]" (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1188.) Such wounds support a finding of intent because they "evidence[ ] deliberate and gratuitous violence beyond that which was necessary to kill the victim." (*Ibid*.)

The special circumstances allegation requires an intent to kill and " 'an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 65.)

"A premeditated intent to inflict prolonged pain is not required." (*Elliot, supra*, 37 Cal.4th at p. 479.)

B.     *Substantial Evidence Supports the Torture-murder Special Circumstance Finding*

Dapremont argues we must reverse the jury's torture-murder special circumstance finding because "[t]he only evidence the [People] offered to support the intent to torture was the nature and extent of Rubio-Delgadillo's injuries." Returning a torture-murder special circumstance finding on this evidence was unlawful, Dapremont contends, because "severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.)

Although we agree with Dapremont that unlike other torture-murder special circumstance cases, the People did not introduce evidence of any statements he made evincing an intent to torture Rubio-Delgadillo (see, e.g., *People v. Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1158-1160 [Hajek made pre-crime statements showing he intended to carry out a sadistic plan to murder]), we disagree that necessarily required the jury to conclude that "[t]here was nothing about the nature of Rubio-Delgadillo's injuries that suggested [Dapremont] inflicted them with an intent to torture."

21

Where, as here, intent cannot be established by a defendant's statements, the requisite state of mind "must be proved by the circumstances surrounding the commission of the offense [citations], which include the severity of the victim's wounds. [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 531; *see also People v. Bemore*, *supra*, 22 Cal.4th at p. 844 ["Certain nonlethal knife wounds, such as those clustered on [the victim's] flank, seem plainly calculated to cause extreme pain and to induce . . . cooperation"].)

The jury could rationally have concluded there was sufficient evidence that Dapremont intended to make Rubio-Delgadillo suffer. Rubio-Delgadillo was a small woman. Dr. Dutra testified the blows to her head may have rendered her unconscious. If so, then Dapremont crushed her rib cage afterwards since that injury was the primary cause of death. She also had no defensive wounds. Her body was also covered in additional, nonlethal bruises. Her teeth were knocked out. Her arm was broken. Breaking teeth and bone, and causing bruising all over her body, required Dapremont to apply considerable force to Rubio-Delgadillo's small frame. And Dapremont was aware of Rubio-Delgadillo's struggle to breathe for as long as three minutes after he crushed her rib cage.

The jury could rationally have concluded that all these injuries "were neither accidental nor lethal in nature, and that they were inflicted *because* the victim was alive, helpless, and capable of experiencing pain." (*People v. Bemore*, *supra*, 22 Cal.4th at pp. 840-841.) The jury may also have rationally concluded Dapremont acted with torturous intent given he watched Rubio-Delgadillo suffocate to death. (See *People v. Chatman*, *supra*, 38 Cal.4th at p. 390 [affirming torture-murder special circumstance finding where the victim was stabbed more than four dozen times, six wounds were non-lethal, evidence supported conclusion the victim was lying

helpless on the floor, and slash to the victim's trachea implied the defendant would have heard labored breathing and gurgling as the victim struggled to breathe].)

We hold sufficient evidence supported the jury's special circumstance finding that Dapremont acted with torturous intent at some time during his 10 minutes (or 12 hours) of killing.

## III. Special Circumstance Deadly Weapon Enhancement

The jury convicted Dapremont of murder in count 1 and further found true he used a deadly and dangerous weapon, a pipe, within the meaning of section 12022, subdivision (b)(1).

Dapremont argues the evidence was insufficient to sustain the jury's personal-use finding as the People did not prove beyond a reasonable doubt that Dapremont used a pipe in the commission of the crime.

We review a sufficiency of the evidence challenge to a deadly weapon enhancement using the same standard applicable to a conviction. (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1197.)

### A. *Applicable Law*

A length of pipe is not inherently deadly or dangerous. (See *People v. King* (2006) 38 Cal.4th 617, 624 [bat]; *People v. McCoy* (1944) 25 Cal.2d 177, 188 [knife].) "In determining whether an object which is not inherently deadly or dangerous has been used as a dangerous or deadly weapon, 'the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.'" (*People v. Blake* (2004) 117 Cal.App.4th 543, 555, fn. omitted.)

### B. *Substantial Evidence Supports the Deadly Weapon Enhancement*

In challenging the jury's finding that Dapremont used a pipe as a deadly or dangerous weapon, Dapremont does not dispute that

Rubio-Delgadillo's DNA was discovered on the pipe. Instead, Dapremont argues there was no evidence that he actually struck Rubio-Delgadillo with the pipe. He contends that Rubio-Delgadillo's DNA could have been transferred onto the pipe "through any number of means."

We disagree that no rational jury could have found Dapremont used his pipe in a deadly or dangerous manner.

Dr. Dutra testified that Rubio-Delgadillo had three lacerations ("where the skin is torn apart") on her head: one on the top of her head, another on the back of her head, and a third above her ear. As indicated above, our review of his coroner's diagram indicates she had four scalp lacerations in total. She also had hemorrhaging on the surface of her brain—injuries severe enough to impair her breathing or render her unconscious. The lacerations on her head were caused by "blunt force trauma." Dr. Dutra explained that because of the skull's curvature, he could not discern whether the cuts on Rubio-Delgadillo's head were caused by being struck with a straight, linear object. The jury saw photographs of these injuries.

True, Dapremont *may* have lacerated Rubio-Delgadillo's scalp in four areas using another instrument, but the only weapon found was the pipe, and the most likely explanation for how her scalp was lacerated and why that pipe was covered in her DNA is that Dapremont hit her on the head at least four times with the pipe.

We conclude substantial evidence supports the jury's finding.

C. *Dapremont Did Not Receive Ineffective Assistance of Counsel*

Dapremont also argues his defense counsel was ineffective for failing to argue insufficient evidence supported the deadly weapon enhancement.

24

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the [effective] assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

A claim of ineffective assistance of counsel requires a showing that (1) defense counsel's performance was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability of a more favorable result in the absence of counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-696 [104 S.Ct. 2052, 80 L.Ed.2d 674].) "A reasonable probability is [defined as] a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) The *Strickland* standards also apply to a claim under article I, section 15 of the California Constitution. (See, e.g., *People v. Waidla* (2000) 22 Cal.4th 690, 718.)

On our review of the record, we discern no deficient performance by trial counsel nor a reasonable probability that the argument Dapremont now makes on appeal would have yielded a different outcome if made below. The pipe was in Dapremont's possession. DNA analysis of the pipe revealed a mixture consisting of 97 percent Rubio-Delgadillo's blood and 3 percent Dapremont's blood. Given this evidence, and the reasons we stated above, Dapremont cannot establish prejudice under *Strickland*, i.e., that better counsel would have persuaded the jury that Dapremont did not use the pipe as an instrument of murder and that somehow it became covered in his victim's DNA for reasons unrelated to the murder.

## IV. The Judgement Is Otherwise Free from Error

### A. *Prosecutorial Misconduct*

Dapremont argues the prosecutor committed prejudicial misconduct during closing argument by arguing that "the only conclusion" to be drawn from the evidence is an intent to kill.

The standard for evaluating claims of prosecutorial misconduct is well settled. A prosecutor's conduct violates a defendant's federal constitutional right to due process when it amounts to a pattern of egregious behavior that infects the trial with unfairness. (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair will amount to prosecutorial misconduct only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. (*Ibid.*) A single instance of misconduct does not amount to a pattern of misconduct warranting reversal. (*People v. Frye* (1998) 18 Cal.4th 894, 979, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Arguments by the prosecutor that otherwise might be deemed improper do not constitute misconduct if they fall within the proper limits of rebuttal to the arguments of defense counsel." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

We find no error in the prosecutor's statements. The prosecutor "is given wide latitude . . . to vigorously argue its case." (*People v. Lee* (2011) 51 Cal.4th 620, 647.) " '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960; see also *People v. Dykes* (2009) 46 Cal.4th 731, 772 [It is " ' "not lightly infer[red]" that the jury drew the most damaging rather

than the least damaging meaning from the prosecutor's statements' "].)

It was the People's theory of the case that Dapremont committed premeditated murder and torture. During his closing argument, the prosecutor explicitly acknowledged that the jury could find Dapremont guilty of second degree murder. Our review of the record convinces us it was clear to the jury that they must return a verdict of second degree murder unless premeditation and deliberation were proven beyond a reasonable doubt.

B.   *The Jury's Request for a Readback of the Prosecutor's Closing Arguments*

Dapremont claims it was reversible error for the trial court to decline the jury's request for a readback of the prosecutor's closing argument. He further argues trial counsel was ineffective for failing to object to the trial court's ruling.

After the jury had begun its deliberations, it sent a note to the trial court asking for a "read back of [the] prosecutor[']s closing arguments." The trial court declined the request, telling the jury that "[t]he prosecutor's closing arguments are not evidence, as directed in [j]ury [i]nstruction 222, and as such cannot be provided to the jury in read back."

We review a trial court's denial of the jury's request for a readback of the prosecutor's closing argument for abuse of discretion. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1260.) The court abuses its discretion if its decision is "arbitrary, capricious or patently absurd manner that result[s] in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)

The trial court did not abuse its discretion. The jury was given correct instructions. It had heard the arguments of counsel immediately before retiring to deliberate and had been deliberating for just over two hours at the time of its request, having deliberated

27

roughly 30 minutes in the morning, then another one hour and 45 minutes in the afternoon. After it was told that it should focus on the evidence, and that the prosecutor's arguments would not be reread, the jury reached a verdict quickly without any further requests for testimony or clarifying instructions.

C.    *Fines and Fees*

Dapremont argues that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the trial court violated his federal constitutional rights by imposing a $30 court facilities assessment (Gov. Code, § 70373) and a $40 court operations assessment (§ 1465.8, subd. (a)(1)) without first assessing his ability to pay. Dapremont makes a related claim that defense counsel was ineffective for failing to object to these assessments.

Dapremont was sentenced on June 20, 2019, after the *Dueñas* opinion was published. He did not raise this claim in the trial court, nor did he express any concern about an inability to pay the assessed amounts—let alone submit evidence of such inability. Thus, he has forfeited his claim. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [the constitutional nature of the defendant's claim regarding his ability to pay did not justify a deviation from the forfeiture rule]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 [ability to pay restitution fine is forfeited by failure to object at the sentencing hearing].)

And even if Dapremont's *Dueñas* challenge were not forfeited, Dapremont has not demonstrated error. Following *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946, we have held that *Dueñas* was wrongly decided. (See *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-282.) His ineffective assistance claim thus fails for lack of error.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED


                                        SINANIAN, J.*


We concur:



    ROTHSCHILD, P. J.



    CHANEY, J.

------

*\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*