Filed 11/8/21  P. v. Saner CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL JAY SANER,<br><br>    Defendant and Appellant. | A159086<br><br>(Mendocino County Super. Ct. No. SCTMCRCR 17-91107) |

A jury found defendant Michael Jay Saner guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found he personally discharged a firearm causing death (*id.*, § 12022.53, subd. (d)) and personally used a dangerous or deadly weapon (variously described as tear gas, pepper spray, bear spray, and mace) (*id.*, § 12022, subd. (b)(1)).  Defendant was sentenced to 50 years to life in prison.

On appeal, defendant contends (1) his counsel was ineffective in failing to object to evidence that he possessed a knife when he was arrested; (2) the trial court erred in failing to instruct the jury on imperfect self-defense sua sponte; (3) the prosecutor misstated the law on provocation during her closing argument and defense counsel was ineffective in failing to object; and (4) there was insufficient evidence to support the finding of use of a dangerous or deadly weapon.

1

The Attorney General points out the trial court failed to impose the enhancement for use of a dangerous or deadly weapon and argues the matter should be remanded.

We remand for the trial court to strike or impose the term for the dangerous or deadly weapon enhancement and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A jury trial began on October 1, 2019.  There was no dispute defendant killed William Martinez on August 6, 2017, and the killing was illegal.  The issue for the jury, as defense counsel explained in his opening statement, was "to decide what kind of illegal killing this was."

*Stipulated Facts*

The parties stipulated to the following facts related to the offense, defendant's arrest, and the criminal history of victim Martinez.  Martinez died of single gunshot wound to the lower right side of his back and the trajectory of the shot was back to front.  Defendant's landlord provided law enforcement a shotgun, which was the firearm defendant "was armed with and used . . . in the commission of the alleged crime."  On August 6, 2017, Mendocino County Sheriff Deputies found defendant in a vehicle at a church in Comptche and arrested him around 9:23 p.m.  Martinez had a prior conviction for manslaughter and aggravated assault in Utah in 1985.

*The Prosecution's Case*

Steven Ohm lived outside the town of Navarro in a rural subdivision.  He allowed Martinez to park his truck on Ohm's property and sleep in his truck.

On August 6, 2017, Martinez arrived at Ohm's property around 5:00 or 5:30 p.m.  Ohm and Martinez sat down to eat dinner outside at a picnic table

next to Ohm's house. Before they started eating, Ohm noticed defendant on his property, "peering around the side of [an out]building."

Ohm testified defendant's eyes met his, then defendant stepped forward and said, "he was going to kill me." Defendant raised "a can of pepper spray or mace" and "started fogging the zone that the table was in." Ohm "ducked to avoid the propellant." Ohm testified that, upon recognizing defendant's voice, Martinez (who was apparently facing away from defendant) spun around, got up from the picnic table, and tried to get away. Defendant "let loose with the . . . shotgun," shooting Martinez in the back. Ohm said to defendant, "What are you doing?" They looked at each other, and defendant turned around and walked away. Defendant did not appear frightened or surprised to Ohm; he had "just a blank stare" and seemed calm.

Ohm testified defendant's emotional state was "very fragile" in the week before the shooting.

The shooting was reported to law enforcement at 6:50 p.m., and Detective Luis Espinoza responded to Ohm's property around 7:40 p.m. He found no weapons on or around Martinez's body.

Defendant was arrested in a church parking lot around 9:30 p.m. A knife was found on his person. In his vehicle, a 12-pack box of beer with six unopened cans was on the front passenger side floorboard, a beer can was in the console, and two plastic gloves were on the front seat.

Espinoza interviewed defendant later that night, and a videorecording of the interview was played for the jury.

Defendant claimed not to know what he was in custody for. Espinoza asked whether he lived with anyone, and defendant started complaining about Martinez, whom he called "Willy." Defendant said Martinez was "a meth head," psychopath, and "registered gang member," who was

3

"threatening my life constantly." Defendant said he kicked Martinez out three different times and Martinez stole his tools. The last time he kicked Martinez out was July 1. He said, "The guy's a fucking whack job. He's fucking nuts. And, uh, and uh, he's constantly threatening to beat—he—he beat the shit out of me. He broke two ribs over here."

Defendant said that on the day of the shooting he gave Martinez $50 in exchange for a key and address where his stolen tools were supposed to be stored. Defendant got a ride from Pastor Moyer to look for the tools, but there was no place matching the address Martinez had given. The pastor gave defendant a ride home, and then he "was just at home drinking" and listening to the radio. That was the last thing defendant remembered. Defendant told the detectives he may have drunk six beers that evening. He said he was "halfway drunk" and he called Pastor Moyer, asking the pastor to meet him behind the church because he did not feel safe at home. He said, "So I went to the church 'cause I was afraid he was gonna come by there and retaliate." Espinoza asked why Martinez would want to retaliate, and defendant responded that Martinez had sold him a van for $150, and Martinez wanted the van back because he could sell it to someone else for $400. Martinez told defendant that he owed Martinez $250.

Defendant denied that he had or owned any firearms and denied firing a gun. He did not remember going to Ohm's house. He said, "Maybe I drank too much and blacked out," adding that he drank brandy and hard alcohol made him black out. While maintaining he did not remember what he did, defendant told the detectives, "I think I lost my mind, you know, at the time. I, I think I, I think I was temporarily fucking insane 'cause I didn't know what the fuck to do." Subsequently, Espinoza told defendant he killed Martinez, and defendant responded, "No way, I killed him, killed him?"

4

The day after the shooting, Espinoza interviewed Douglas Moyer, the pastor of the church in Comptche where defendant was arrested. The parties stipulated that the jury could accept the transcript of Pastor Moyer's interview as his testimony.

Moyer told the detectives he was aware of conflict between defendant and Martinez. Moyer did not know whether to believe all of defendant's complaints about Martinez.

The day of the shooting, Moyer gave defendant a ride to look for a storage locker where Martinez said defendant's tools were. Defendant told Moyer he was trying to get a restraining order and did not know how to do it. At one point, defendant asked Moyer, "If I . . . have a restraining order, then can I shoot him if he comes around?"

On the drive back to defendant's place, they saw Martinez in his truck. Moyer pulled over, and defendant and Martinez talked to each other. Martinez said defendant owed him money for a van, and defendant said he had paid for the van and he needed his tools. Moyer described the conversation as "a little heated, particularly from [defendant]." Martinez "was more subdued, but just as emphatic." But neither one threatened the other. After this interaction, defendant "was calm" and said he was done with Martinez. Moyer drove defendant to a market, where he bought beer. Defendant told Moyer he had to drink a beer to calm down and said, "He better not come around." Moyer dropped defendant off at his place around 5:00 p.m. Defendant said he had a shotgun and that he would shoot Martinez in the leg to make him tell him where his tools were. Moyer described defendant as "very frustrated," but he thought defendant's reference to his shotgun was only bravado.

5

In his investigation, Detective Espinoza reviewed a series of 911 calls. Martinez called 911 from a pay phone multiples times on August 1. In the calls, Martinez reported that defendant stole his van. In one call, Martinez told the dispatcher, "Mike [Saner] just crashed through the fence in my van. He's got the gun in the front seat, he almost ran me over, and he's out on the road now driving and he's drunk. So I think I can catch him between here and Ukiah, but I'm going to get my gun, too." The dispatcher told Martinez not to put himself in any danger, and Martinez responded, "No, I want to get him. He's drunk, he's got my van."

*Defense*

The defense theory was the killing was manslaughter—either involuntary because defendant was unconscious at the time of the offense due to voluntary intoxication or voluntary because he acted in a heat of passion. The defense called witnesses who had seen defendant immediately before and after the shooting, witnesses to establish defendant had been afraid of Martinez for some time and that he had reason to be, and expert witnesses to address the potential physiological effects of alcohol and the medications defendant was taking. Defendant also testified.

Ohm's neighbor, Janet Roberts, was sitting in her car in Ohm's driveway in the early evening of August 6 and saw defendant walk down Ohm's driveway. She said, "Hi, Mike," and defendant responded, "I am going to get Willy." She testified defendant had a revolver and appeared "pretty focused on his mission." Evidence was also presented that Roberts told law enforcement defendant was wearing a black glove and was unstable on his feet, drunk, and "crazy" when she saw him in Ohm's driveway.

Lucas Weinrich, a logger, encountered defendant in the woods after the shooting. He testified defendant seemed "[a]ll whacked out." Defendant did

6

not seem like he knew what was going on, and "he was fidgety and [a] little bit confused." Weinrich, who had never seen defendant before that evening, testified, "he said that he just peppered sprayed—or bear sprayed an individual who was a known gang banger, registered gang banger from . . . LA. And he stated that that guy was looking for him and was going to— wanted to kill him." Defendant said he was lost and looking for a place to stay, and he was concerned the cops might find him. Defendant remained in the area for about an hour to 90 minutes and drank a beer and smoked two cigarettes. Weinrich was concerned for his own safety because defendant had a large knife in the rear pocket of his shorts.

Defendant's son Jesse Saner testified he met Martinez at the Hospitality House in Fort Bragg.[1] He thought Martinez was "one of the nicer guys" who "talked about God and stuff like that." Jesse introduced Martinez to defendant. Later, defendant started leaving Jesse voicemails saying Martinez was causing him problems and Jesse had to "get this guy out of here." Defendant was "extremely fearful" and said Martinez beat him up and broke some ribs. After a week or two of messages, Jesse went to defendant's place to tell Martinez to leave, but defendant said they made amends and had forgiven each other.

Defendant's cousin testified that a few days before the shooting, defendant asked him to go with defendant to get a restraining order against Martinez because he feared for his life. Defendant "looked pretty scared, frantic." An acquaintance of defendant's testified that around late July or early August of 2017, defendant was looking for a place to hide out from a

_____

[1] Jesse described the Hospitality House as a place that gave out free lunches and allowed people to stay, but there were "pretty bad characters in there."

7

guy who was after him.  Defendant told the acquaintance that he might have to "shoot the guy" to protect himself.  Another witness testified that Martinez "was pretty aggressive" and muscular.

David Evans, who managed the Navarro General Store, got along with both defendant and Martinez for the most part.  He testified that defendant "definitely was terrified of the situation" with Martinez.  On one occasion, defendant said Martinez hit him, and defendant had a black eye and looked "banged up a little bit."  Defendant "beg[ed]" Evans for help and said, "You don't understand.  He's going to kill me.  He's going to get me."  Evans described defendant as "very shaky, he would be trembling," although Evans did not know "how much was the alcoholism."

Evans recalled seeing Martinez parked in front of the store sitting in his truck a few times.  Evans asked what he was up to, and Martinez responded that he was waiting for defendant and, "I am going to get him."  A few days later, Martinez was parked in front of the store again.  Martinez said, "Everything is good, but I am getting him."  Evans asked Martinez what he meant, and he said, "I'm making him go crazy.  You will see.  He's almost there," and "I am going to get him so he blows his own brains out."  Evans testified that Martinez told him at least three or four times that he was trying to drive defendant crazy so he would kill himself.  Evans did not think Martinez was joking.

Psychologist Kevin Kelly testified as an expert in forensic psychology. He assessed defendant's mental status in jail and diagnosed him with schizoaffective disorder in combination with alcohol and prescription drug abuse.[2]

---

[2] Kelly testified defendant was anxious, depressed, highly dependent, and psychologically masochistic.  He further described him as a "sad sack,"

Regarding defendant's claim that he may have blacked out from drinking, Kelly testified that a person who is blacked out may appear functional to others and that "the main feature of a blackout is the person themselves does not remember that at [a] later point."

On cross-examination, Kelly testified nothing in his testing of defendant indicated he was unable to premeditate a murder. Defendant did not suffer from hallucinations or delusions and his memory was not impaired. Kelly agreed that evidence showing defendant was able to plan by taking gloves, bear spray, and a knife with him when he went to confront Martinez on the evening of the shooting indicated "some kind of coherent thought patte[r]n."

A blood sample was drawn from defendant around 1:30 a.m. August 7. The blood alcohol content was .06 percent, and hydrocodone, an opiate analgesic, and clonazepam, a benzodiazepine typically prescribed for anxiety, were detected. Testifying as an expert in forensic toxicology, criminalist Jennifer Batt explained hydrocodone is a central nervous system depressant that tends to make people sleepy, "may affect their ability to make decisions cognitively," and may affect coordination and muscle control. Clonazepam has some similar effects; both drugs "can impair motor skills, can impair judgment and can impair cognition." Taking the drugs with alcohol could increase the sedating effects and blackouts are a possibility.

Assuming defendant stopped drinking at 7:00 p.m. (around the time of the shooting), forensic toxicology expert Kristina Rosenfeld estimated defendant's blood alcohol content at that time was around .15 to .25 percent.

---

who had "a litany of complaints about how unfair people have been to [him] all his life. His brothers when he was younger. His parents, mother, failed marriages." By defendant's account, "almost everyone . . . wronged him in some way."

9

Rosenfeld testified that a blackout, meaning "you are conscious, yet unable to remember that an event occurred," is "probably likely" for an average experienced drinker when his blood alcohol content is at .2 percent. On cross-examination, she agreed there is no standard measurement for when a person would experience a blackout or for whether "somebody could not form the intent to premeditatedly kill somebody."

Dr. Apfel testified defendant was his patient since January 2013. He treated defendant for chronic back pain and prescribed hydrocodone. Defendant was prescribed 40 milligrams of hydrocodone per day, to be taken in 10 milligram tablets every six hours. He was also prescribed clonazepam for anxiety. Testifying as an expert regarding the effects of alcohol and drugs on the human body, Apfel estimated the amount of hydrocodone in defendant's system at 7:00 p.m. (around the time of the shooting) was equivalent to taking three or four 10-milligram tablets at once assuming defendant did not take any additional medication after 7:00 p.m. He testified the additive effects of hydrocodone, clonazepam, and alcohol taken together could cause nausea, vomiting, dehydration, dizziness, loss of coordination, marked inhibitions, and abnormal behaviors. A blackout would be possible. A person could lose consciousness, meaning pass out. On cross-examination, Dr. Apfel testified that defendant denied any injury or trauma at his checkup on July 28, 2017.

Defendant was 60 years old at the time of the trial. He considered himself an alcoholic and testified he drank "about a 12-pack a day" up to "about 18 beers a day or something like that." He testified that he previously lived in San Pedro, where he was beaten up and robbed three times by gang members who were Southsiders.

Defendant met Martinez through Jesse (defendant's son) and invited him to his place. Defendant rented a 10-acre property in Navarro.[3] He let Martinez stay in a motor home about 30 feet from his cabin. For the first few weeks, Martinez "seemed okay"; he helped defendant take care of the property. Martinez told defendant that he was in a gang, "Southsider gang, 18th street gang down there in Los Angeles" and showed him his gang tattoos.[4] Martinez said he stabbed someone to death, and he was in prison for nine years for manslaughter. After a few weeks staying on the property, Martinez said to defendant, "oh, you could kill somebody out here, and nobody would ever even know about it."

Defendant helped Martinez get a job, and after Martinez was paid, "he started acting weird and like he was on drugs." On the weekend, Martinez "would be up all night . . . pounding on the motor home." Defendant kicked Martinez out three times, but "he kept coming back saying he wouldn't do it anymore." Defendant "kept taking him back because [Martinez] was paying [him] . . . about $200 a month" to stay in the motor home, and defendant needed the money.

Defendant testified that on one occasion, Martinez hit him in the chest and face and may have cracked a rib. Defendant did not call the police about this incident because he thought he had warrants in Los Angeles for drunk driving.

Defendant kicked Martinez out for good on July 4. Later that day, Martinez returned to the property. Defendant had his shotgun, and Martinez said, "you better keep that shotgun on you because . . . if I see you on [the]

---

[3] Defendant and Ohm lived on the same street.

[4] Detective Espinoza testified Martinez had tattoos that resembled gang tattoos, including ones that read "18th street" and "Southsider."

streets, I'm going to beat the shit out of you. And I'm going to kill you. I'm going to kill your dog and break all [the] windows out of your car." Martinez threw a rock and broke the back window of defendant's car. A few days later, three windows were broken in defendant's motor home, and defendant assumed Martinez did it.

One day in early July, defendant drove drunk, and as a result, he lost his car,[5] and he spent July 12 to 25 in jail. When defendant got out of jail, he found Martinez in his house with a girl. Martinez told defendant the landlord had come by and said he wanted defendant to move out by the end of the month. Martinez said the landlord told him to take defendant's belongings out of the cabin and put them in his motor home. Defendant realized his tools were missing, and he called the police. He testified that Martinez "just took over my house and stole everything I owned" while he was in jail. Despite this, defendant asked Martinez if he wanted to sell his van, and defendant bought it from him for $100. Later, Martinez wanted his van back and told defendant he owed him more money. On August 1, Martinez broke the windshield of the van and left, and the next day, defendant went to the courthouse to get restraining order papers to fill out.

Defendant testified that Martinez threatened him at least five to seven times. The last time was August 5. Defendant testified he was afraid of Martinez and scared for his life. He thought Martinez was serious because he had gang tattoos, and he said his cousin was a shot caller in prison.

On August 6, defendant "just wanted to get drunk and forget about everything." He testified he did not remember leaving his home that evening. He did not recall talking to Ohm, being arrested, or talking to Detective

---

[5] Defendant testified he drove drunk and "got stuck in the forest. And then the exhaust pipe lit some branches on fire, and [his] car burned up."

Espinoza. Defendant testified he did not intend to shoot Martinez. Asked how he felt in the weeks leading up to August 6, he responded, "Just I was afraid for my life. I was frustrated. I wasn't getting any help from my friends or the law enforcement agency. Or I just felt like I was all alone. Like I was, you know, I'm all alone on 10 acres of land with some crazy guy coming by my house on [a] regular basis breaking my windows out. And stealing my stuff. And threatening my life. I didn't—I didn't know what to do. I was—I was just at a loss of things to do. Avenues to try, whatever."

On cross-examination, the prosecutor asked about defendant's prior criminal convictions. Defendant did not deny that he was convicted of brandishing a weapon and threatening somebody; he explained he pulled a knife on people who followed him down an alley.

Recordings of defendant's 911 calls were played for the jury. On July 29, defendant told the dispatcher that Martinez stole all his stuff, including tools worth $3,000 or $4,000. On August 2, defendant reported that Martinez had threatened to kill him the previous day and now Martinez was back at defendant's house threatening him again. He told the dispatcher Martinez was blocking his driveway with his truck and he had a "big . . . butcher knife that he carries with him everywhere." The dispatcher asked whether defendant had any weapons law enforcement should know about, and he said he did not have any weapons.[6] Defendant said the police had been there the previous day and told Martinez not to come back.

## DISCUSSION

A.  *Defense Counsel's Failure to Object to Evidence Defendant Had a Knife*

---

[6] At trial, defendant testified he did not tell the dispatcher he had any weapons because he had a felony on his record from a long time ago, and he did not want to get in trouble for it.

Defendant contends defense counsel was prejudicially ineffective in failing to object to evidence that a knife was found on his person at the time of his arrest. He relies on *People v. Barnwell* (2007) 41 Cal.4th 1038 (*Barnwell*), in which the court observed, "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 1056; see *People v. Riser* (1956) 47 Cal.2d 566, 577 [same].)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*); accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [habeas corpus is the more appropriate procedure to address an ineffective assistance of counsel claim because it may include evidence of an attorney's reasons for making the complained-of decision, which is outside the appellate record].)

In this case, the record is silent as to why defense counsel did not move to exclude evidence of the knife. Defendant asserts this is one of those rare cases where there could be no conceivable tactical purpose for counsel's

14

failure to object to the evidence. We disagree. We discern two possible reasons for counsel's omission.

First, we agree with the Attorney General that defense counsel reasonably could have determined that seeking to exclude the evidence was unnecessary because the jury would infer defendant was carrying the knife in self-defense, which would tend to corroborate defendant's testimony that he feared Martinez. Further, the jury heard evidence of defendant reporting to a 911 dispatcher on August 2 that Martinez carried a big butcher knife everywhere. That defendant later was found armed with a knife would be understandable under these circumstances. Counsel also may have figured the jury would learn that defendant carried a knife for self-defense anyway once defendant decided to testify on his own behalf.[7]

Second, although evidence showing a defendant possessed a weapon is not admissible to establish "he is the sort of person who carries deadly weapons" (*Barnwell*, *supra*, 41 Cal.4th at p. 1056; Evid. Code, § 1101, subd. (a)), such evidence is admissible if relevant to an issue other than propensity. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1072–1073 [evidence of firearms connected to the defendant but not to the charged shootings was relevant and admissible to show the defendant "was a gang member at war with a rival gang"]; *People v. Cox* (2003) 30 Cal.4th 916, 955–957 [guns found in the defendant's car were relevant "as weapons that could have been used to coerce the victims into defendant's car or otherwise subdue them, 'in

_____

[7] Recall the prosecution asked about defendant's prior conviction for brandishing a weapon in cross-examination. Defendant described the incident leading to the conviction: "There was two people following me down the alley at night and they look [like] gang members, and I pulled my knife on them and told them to stay away from me."

15

furtherance of the criminal plan' to kill them"], disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In *People v. Jablonski* (2006) 37 Cal.4th 774, for example, when the defendant was arrested out-of-state a few days after he murdered two women, he was found with a roll of duct tape, homemade wire handcuffs, and a stun gun. In response to defense objections to evidence of the handcuffs and stun gun, the prosecutor argued the items showed defendant was "prepared to restrain or immobilize the victims . . . and they were therefore relevant to premeditation." (*Id.* at p. 821.) Our Supreme Court agreed the evidence was relevant and admissible, reasoning, "premeditation was a disputed fact and evidence that defendant carried devices to the crime scene that could have been used to restrain or immobilize the victims was relevant to premeditation." (*Ibid.*)

Here, defendant was arrested shortly after the shooting with gloves, bear spray, and a knife. Defense counsel, aware of the foregoing authority, may have determined that a motion to exclude the knife likely would be overruled on the ground the evidence was relevant to show planning and premeditation. Given the defense of unconsciousness, counsel may have thought the evidence also could be relevant to show defendant's general awareness of his actions. As we have seen, the prosecutor relied on the evidence to elicit testimony from Dr. Kelly that taking gloves, bear spray, and a knife to confront Martinez showed defendant was able to think coherently the evening he killed Martinez. "Where a sound legal basis exists for the admission of evidence, an attorney is not ineffective for failing to object to its introduction." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1313.)

16

On this record, we reject defendant's claim that defense counsel was ineffective for failing to object to evidence he had a knife when he was arrested.

B.     *Lack of Jury Instruction on Imperfect Self-Defense*

Defense counsel requested CALCRIM No. 571, the jury instruction on voluntary manslaughter, imperfect self-defense. The trial court denied the request, reasoning there was no evidence of "imminent danger to Mr. Saner from Mr. Martinez at the time that the fatal wound occurred."

On appeal, defendant claims the trial court erred when it failed to instruct the jury, sua sponte, on voluntary manslaughter based on imperfect self-defense. We disagree.

A trial court has a sua sponte duty to instruct the jury "on all theories of a lesser included offense which find substantial support in the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) It is not that " 'any evidence, no matter how weak' " warrants instructions on lesser included offenses; rather "such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Ibid.*)

An unlawful killing with "malice aforethought" is murder. (Pen. Code,[8] § 187.) Malice is negated, and an intentional killing is reduced to the lesser included offense of voluntary manslaughter, when the defendant acts upon a heat of passion or "kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense." (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

"Imperfect self-defense . . . arises when a defendant acts in the actual but unreasonable belief that he is in *imminent* danger of death or great bodily injury." (*People v. Duff* (2014) 58 Cal.4th 527, 561, italics added.) "[P]urely

_____

[8] Further undesignated statutory references are to the Penal Code.

delusional perceptions of threats to personal safety cannot be relied upon to claim unreasonable self-defense." (*People v. Elmore* (2014) 59 Cal.4th 121, 138–139.)

In this case, there was no evidence defendant held a good faith but unreasonable belief that Martinez posed an imminent danger to him when he killed Martinez. The evidence showed Martinez was sitting down to eat dinner on Ohm's property unaware of defendant's presence when defendant approached and sprayed pepper spray or other chemical irritant; when Martinez tried to get away from defendant, defendant shot him in the back. Nor did defendant testify that he thought Martinez was an imminent danger to him at the time of the shooting.

Defendant acknowledges the absence of affirmative evidence but argues, "Although there was no evidence of any particular act of aggression by Martinez the day of, or within hours of, the shooting, a reasonable jury could not rule out such an act." It should go without saying, however, that speculation about what might have happened between Martinez and defendant after Pastor Moyer dropped defendant off at his home does not rise to the level of substantial evidence that would require a sua sponte instruction on imperfect self-defense.

Defendant next argues the evidence was sufficient for the jury to find that defendant believed "he faced mortal danger at the time of the shooting." But imperfect self-defense requires the defendant believe the danger is *imminent* when he kills. "To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the

18

near future. *An imminent peril is one that, from appearances, must be instantly dealt with.' . . ."* Put simply, the trier of fact must find an *actual* fear of an *imminent* harm.' " (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.) We reiterate, there was no evidence defendant believed Martinez posed an imminent danger when he killed him. Defendant testified about his state of mind but never suggested he killed Martinez because he believed Martinez posed an imminent threat that had to be "instantly dealt with" at the time he shot Martinez. Instead, defendant testified that he did not remember the shooting at all and that he did not intend to shoot Martinez.

On this record, there was no evidence that defendant was guilty of only voluntary manslaughter based on imperfect self-defense substantial enough to merit consideration by the jury. Accordingly, the trial court did not err in declining to give an instruction on imperfect self-defense.

C.    *Defense Counsel's Failure to Object to the Prosecutor's Discussion of Provocation in Closing Argument*

Defendant argues defense counsel was prejudicially ineffective in failing to object to the prosecutor's misstatement of the law on provocation and second degree murder. We are not persuaded.

1.    Background

Provocation may reduce first degree murder to second degree murder or voluntary manslaughter. "To reduce a murder to second degree murder, premeditation and deliberation may be negated by heat of passion arising from provocation. [Citation.] If the provocation would *not cause an average person to experience deadly passion* but it precludes the defendant from *subjectively* deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332, italics added.) If, in addition to provoking the defendant subjectively, "the provocation would cause a reasonable person to react with deadly passion,

19

the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter." (*Ibid.*)

The jury in this case was properly instructed on murder (CALCRIM No. 520), first degree murder (CALCRIM No. 521), and voluntary manslaughter, heat of passion (CALCRIM No. 570). The jury was also given CALCRIM No. 522, which provides: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

In closing argument, the prosecutor misstated the law on provocation and second degree murder. After advocating for a verdict of first degree murder, the prosecutor addressed second degree murder. She argued defendant did not meet the criteria and said, "provocation talks about the fact that it's not just provocation, and that the defendant acts rashly, under intense emotional, *but an average person, a person of average disposition* that in that situation to act, it would have caused them to act rashly, without due deliberation to cause you to act from passion rather than judgment. [¶] He didn't act rashly. And he wasn't under intense emotions." (Italics added.) The prosecutor did not mention "voluntary manslaughter" at all, and then moved on to discussing involuntary manslaughter based on voluntary intoxication.

Thus, it appears the prosecutor mistakenly conflated second degree murder based on provocation—which only requires provocation that precludes the defendant himself from *subjectively* deliberating or

20

premeditating—and voluntary manslaughter based on provocation—which further requires "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment" (CALCRIM No. 570).

The jury was also instructed, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.)

2.    Analysis

As we have described, we defer "to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*Mai*, *supra*, 57 Cal.4th at p. 1009.) Our Supreme Court has repeatedly observed that "failure to object only rarely constitutes ineffective representation." (*People v. Caro* (2019) 7 Cal.5th 463, 514 [rejecting claim of ineffective assistance based on failure to object to prosecutor's closing argument]; (*People v. Gray* (2005) 37 Cal.4th 168, 207 [same]; *People v. Wharton* (1991) 53 Cal.3d 522, 567 [same].)

Here, the record is silent as to why defense counsel did not object to the prosecutor's misstatement. The defense theory was that defendant was guilty of only manslaughter either because he was unconscious or because he acted in an objectively reasonable heat of passion, while the prosecution's theory was that defendant was guilty of first degree murder. As the Attorney General suggests, defense counsel may have refrained from objecting because he did not want to highlight the prosecutor's argument or the theory defendant might be guilty of second degree murder. (See *People v. Wharton*, *supra*, 53 Cal.3d at p. 567 ["counsel might not have wanted to highlight the point with the jury"].) Weighing the potential downside of highlighting second degree murder against the need for the jury to be correctly educated

21

on the law, counsel reasonably may have decided not to object because the jury instructions were correct and complete and the jury was specifically told to follow the jury instructions rather than attorney comments.

Further, even if we assume deficient performance, defendant has not shown prejudice. (*Mai, supra*, 57 Cal.4th at p. 1009 [a claim of ineffective assistance of counsel requires a showing of "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different].)

Defendant suggests the prosecutor's misstatement may have caused the jury to reach a verdict of first degree murder *even if* one or more of the jurors found Martinez's ongoing behavior "drove [defendant] to act rashly and impulsively" but the behavior was not "sufficient to cause an ordinary person to act in a deadly rage." However, the jury was instructed that first degree murder requires the prosecution to prove the defendant "acted willfully, deliberately, and with premeditation" and *"[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."* (CALCRIM No. 521, italics added.)[9] If, as defendant surmises, one or more of the jurors determined that defendant acted "rashly and impulsively," then they could *not* have found he committed first degree murder following the jury instruction given.

We do not believe it is reasonably likely the jury understood the prosecutor's passing reference to "a person of average disposition" to mean defendant could be found guilty of first degree murder even if he acted rashly

---

[9] The jury was further instructed: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (CALCRIM No. 521.)

and impulsively. But, even if the jury thought that was what the prosecutor meant, the trial court told the jury, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) Because we presume the jury followed the court's instructions rather than any conflicting statement by the prosecutor (*People v. Holt* (1997) 15 Cal.4th 619, 662), defendant fails to demonstrate prejudice.

D.      *Sufficiency of the Evidence of Use of Dangerous or Deadly Weapon*

Defendant next contends there was insufficient evidence to support the jury's finding that he used a dangerous or deadly weapon.

" '[T]o find "true" a section 12022(b) allegation, a fact finder must conclude that, during the crime or attempted crime, the defendant himself or herself intentionally displayed in a menacing manner or struck someone with an *instrument capable of inflicting great bodily injury or death. . . .'* . . . In determining whether an object . . . has been used as a dangerous or deadly weapon, 'the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*People v. Blake* (2004) 117 Cal.App.4th 543, 555 (*Blake*), italics added; see CALCRIM No. 3145.)

Here, Ohm testified defendant "fogg[ed]" the picnic table where he and Martinez were sitting with "a can of pepper spray or mace" before shooting Martinez in the back, and Weinrich (the logger who came across defendant in the woods) testified that shortly after the shooting, defendant said he had just pepper sprayed or bear sprayed a "gang banger" who "wanted to kill

23

him," apparently referring to Martinez. Further, Jesse testified defendant told him he had to use pepper or bear spray on Martinez.[10]

The Attorney General argues Ohm's testimony was sufficient to support the jury's finding. He notes that courts have recognized chemical sprays such as pepper spray and mace are capable of causing great bodily injury, citing *Blake*, *supra*, 117 Cal.App.4th 543. In *Blake*, the Court of Appeal concluded evidence that a chemical spray was used to temporarily disable robbery victims was sufficient to support a dangerous weapon finding. (*Id* at p. 559.) The *Blake* court observed, "Most [out-of-state] courts have found tear gas, mace or pepper spray to be dangerous or deadly weapons capable of inflicting great bodily injury." (*Id.* at p. 557.)

In his reply brief, defendant does not dispute that pepper spray and mace are capable of causing great bodily injury. Instead, he argues Ohm's "conjectural lay opinion . . . as to the nature of the spray" was insufficient to establish the substance he sprayed *was* pepper spray or mace. Defendant's argument, however, ignores the testimony of Weinrich and Jesse, which show defendant himself told them he used pepper spray or bear spray on Martinez.

In *Blake*, the appellate court found sufficient evidence of use of a dangerous or deadly weapon where the victim testified the defendant took a canister out of his purse and said, "Give me money or I am going to mace you." (117 Cal.App.4th at p. 548.) In this case, there was evidence defendant sprayed a substance apparently intended to debilitate or disorient Martinez and Ohm, and when Martinez tried to get away, defendant shot him in the back. There was also evidence defendant admitted to two witnesses that he

---

[10] Jesse's testimony came about when defense counsel asked whether his father had pepper or bear spray. He responded, "I can't remember if he had it, but he told me that yeah he had to use it on Willy [Martinez]."

24

used pepper spray or bear spray on Martinez.  We conclude this was sufficient evidence to establish defendant used a chemical spray (such as pepper spray, bear spray, or mace) as a dangerous or deadly weapon.  (See *Blake*, *supra*, 117 Cal.App.4th at p. 559.)

E.      *Failure to Impose or Strike the Weapon Enhancement*

The trial court did not impose the one-year term for use of a dangerous or deadly weapon under section 12022, subdivision (b)(1), and did not expressly strike the enhancement either.  The Attorney General urges that we remand the matter for the court to strike or impose the term for the enhancement, and defendant does not object.  (See *People v. Irvin* (1991) 230 Cal.App.3d 180, 192 [a trial court's failure to either strike or impose an enhancement is an unauthorized sentence that can be corrected by remand of defendant's appeal].)  We will remand the matter for resentencing.

## DISPOSITION

The matter is remanded to the trial court to exercise its discretion whether to impose or strike the enhancement under section 12022, subdivision (b)(1).  The judgment is otherwise affirmed.

_____
Miller, J.

WE CONCUR:


_____
Kline, P.J.


_____
Stewart, J.


A159086, *People v. Saner*